Filed 4/6/21  In re Christian P. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re CHRISTIAN P. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CRYSTAL E.,<br><br>    Defendant and Appellant. | F081686<br><br>(Super. Ct. Nos. 08CEJ300045-1, 08CEJ300045-2, 08CEJ300045-3)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from orders of the Superior Court of Fresno County.  Brian M. Arax, Judge.

Carolyn S. Hurley, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Levy, Acting P.J., Franson, J. and Peña, J.

Crystal E.'s (mother) children, Christian, Sebastian, and L.M., were removed from her custody and placed in foster care after reunification services were denied. A Welfare and Institutions Code section 388[1] petition was filed by mother and heard at the same time as the section 366.26 hearing. The juvenile court denied the section 388 petition, terminated mother's parental rights, and set a permanent plan of adoption for the three children. Mother appeals, contending the juvenile court abused its discretion when it denied her section 388 petition and erred in failing to find various exceptions to adoption and termination of her parental rights. She also contends the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.) inquiry was inadequate. We find no error and affirm.

## STATEMENT OF THE CASE AND FACTS

### *Petition*

The Fresno County Department of Social Services (department) filed an amended section 300 petition June 12, 2019 alleging 15-year-old Christian, 12-year-old Sebastian, and eight-year-old L.M. were at risk of harm due to mother's substance abuse. The children were found to be living in an unsafe and unsanitary home, with dirty dishes, spoiled food, trash, dirty clothing, and no electricity.

Mother had received previous reunification services in 2008 and 2015, which included substance abuse treatment, but tested positive for methamphetamine on June 6, 2019. Each of the children had different fathers: the fathers of Christian and L.M. were in prison, Sebastian's father's whereabouts were unknown. It was reported by the social worker that none of the children had known Indian ancestry.

The report prepared for detention stated that the department had still not decided whether to recommend services to mother or any of the fathers, considering previous dependency history and the current circumstances. The department would provide

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2.

referrals for random drug testing for mother, and mental health evaluations and treatment for the children.

Further details of the precipitating event of June 5, 2019, emerged. Sebastian had arrived late and inappropriately dressed for his sixth grade graduation. Mother, who was present, acted bizarrely, with slurred, rapid speech. Sebastian was distraught and had to be taken home. Once back at the house, the social worker and police officer reported both mother and maternal grandmother, who lived in the home, acting oddly. Mother was behind on rent and the house had no electricity. Maternal grandmother reported that mother left at night to "collect trash and things on people's sidewalks to sell for money."

L.M., who was present, was appropriately dressed and well-groomed. She reported that mother left at night with friends, while maternal grandmother stayed with the children. L.M. reported always having food to eat and, while she did not always get along with mother, she was not afraid of her. Christian and Sebastian reported similar scenarios, both denying mother's drug use. Sebastian, who was at an aunt's house, reported that mother allowed different men into the house who did not leave when asked.

The aunt's house was assessed to be safe, and she agreed to allow the children to stay for the night. The aunt had not had contact with mother and maternal grandmother for over a year due to their prior drug use. While she agreed to allow the children to stay another night with the aunt, the children returned to mother's care that day.

Mother attended the team decision meeting on June 7, 2019, but she was under the influence with severely slurred speech. During the meeting, mother threw herself on the floor and promised to go into treatment.

A safety plan was devised to allow the children to stay at aunt's house with maternal grandmother, while mother was at work. The aunt advised the social worker that the children had warned her they would run away if the department or law enforcement came to detain them.

On June 10, 2019, the aunt called to say she could no longer keep the children as maternal grandmother had become ill and mother had been staying in her apartment for the weekend and she no longer wanted her there.

The department then made a safety plan with maternal grandfather, who said he could keep the children for a few days. Maternal grandfather expressed frustration with mother's refusal to change.

On June 11, 2019, the children were detained from maternal grandfather's home. Visitation was recommended to be no less than once a week, supervised.

*Detention*

No fathers were present at the June 13, 2019, detention hearing. Mother completed an ICWA-020 form claiming Yaqui and Cherokee heritage. At the hearing, the juvenile court found that continued custody with mother was contrary to the children's welfare, that the ICWA may apply, and jurisdiction and disposition were set for July 18, 2019.

*Jurisdiction/Disposition*

The report prepared for jurisdiction/disposition indicated that mother had no criminal history. She admitted to drug relapse and drug use twice a week since September of 2018. Mother, who admitted substance abuse since age 14, acknowledged her need for treatment and had placed herself into a residential treatment center.

The department recommended reunification services be by-passed, pursuant to section 361.5, subdivision (b)(10), as mother had been offered previous reunification services and services had been terminated. The department opined that section 361.5, subdivision (b)(13), denial of services due to previous attempts at drug treatment, was also applicable.

The department also recommended that the fathers not be offered services, as two were in prison and none had a strong bond or been involved in their children's lives.

While the children loved mother and missed her, they also acknowledged her need to be clean and sober. And while the children wanted to return to mother, they were hesitant as they had been "through this" twice before. All three were developmentally on track and all had been referred for mental health assessments. Visits with mother had gone well. The children liked their foster home and stated that they were having fun.

At the contested hearing, which was finally held October 22, 2019, Christian testified that he was happy at home before he was detained. Mother had provided him with food, and he felt safe. He knew mother was using drugs because she would stay up all night and fall asleep in the day. Christian reported that maternal grandmother took good care of them. He liked his visits with mother and wanted the opportunity to have unsupervised visits.

Christian testified that he wanted to reunify with mother, as did his siblings, even though he liked his foster home. While Christian did not remember the first time he went into foster care, he did remember the second time was hard. This time was not as difficult. According to Christian, mother did not use drugs when she was working, but things began to go "downhill" when her car was stolen, and she could not get a job.

It was stipulated that L.M. wanted to go home and that visits with mother went well.

Mother testified that she relapsed five months before the children were detained and she went into treatment the day after they were removed, was now in aftercare, and continued to test negative. She was attending NA/AA two to three times a week and was looking for employment. Mother acknowledged the need for positive support, which she had not utilized during her previous treatment attempts.

The social worker testified that the department was still not recommending reunification services. While mother had just finished a residential treatment program, she had done so twice before and had not benefitted from them or previous parenting classes. The social worker, however, had not had a recent conversation with mother or

the children. While she knew the children were happy in their current foster care placement, she did not know if they wished to be adopted. The social worker's concern was mother's ability to maintain sobriety because this was the third time the children had been removed for the same issues. Mother had completed four substance abuse treatment programs and the longest she had stayed sober was for seven or eight months. She admitted to using methamphetamine while caring for her children. The social worker opined that mother minimized her drug use and did not demonstrate remorse, noting she had claimed Sebastian was fine as he was doing well in school.

Minors' counsel argued that, while the children wanted to reunify with mother, the bypass requirements were met. Counsel encouraged mother to continue treatment regardless of the juvenile court's decision, as the matter could be revisited before a section 366.26 hearing.

The juvenile court found the children to be dependents of the court and removed them from mother's custody. Mother and all three fathers were bypassed for services and a section 366.26 hearing set for January 29, 2020. Mother's once a week visits were continued. After a motion by the department, the juvenile court found the ICWA inapplicable.

### Section 388 Petition

On January 28, 2020, mother filed a section 388 petition asking that the children be placed with her on family maintenance or order that she receive reunification services and increased visitation. Mother alleged changed circumstances as she had completed residential treatment, an outpatient aftercare program, parenting classes, she was participating in mental health services, and she continued to drug test negative. Mother alleged the children were older and bonded to mother, and that she had worked hard to provide them with a stable life. Mother attached various certificates of completion to her petition.

6.

Due to various continuances, the case was not scheduled until August 11, 2020. Mother's trial brief attached additional negative drug tests, letters of support from her church, and a letter from a person she provided home care to, as well as a letter from a friend and a letter from behavioral health services. Mother was employed and enrolled in classes to become a juvenile correctional officer.

*Report for Section 366.26 Hearing*

The report filed for the August 11, 2020 hearing was written for the January 29, 2020 hearing. At that time, the children were reported to be in their original placement, the boys were doing well in school and L.M. was improving. Mother attended visits regularly and was sober, appropriate and engaged with the children.

L.M. was considered to be generally adoptable, while the boys were not, due to their ages. The three children together were specifically adoptable as they were placed with a family that expressed a desire to adopt them. The two boys stated they would like to be adopted, but L.M. was not certain. It was assessed, however, that it would be in her best interests.

A June 2020 addendum report observed the children to enjoy visits with mother. However, while L.M. looked forward to the visits, the boys, at times, elected to miss the visits.

Mother continued to be sober. She reported that, if the children were not returned to her care, she was in support of them being adopted by the current caregivers.

*Section 388 and Section 366.26 Hearing*

At the August 12, 2020, hearing, the juvenile court noted that the children had been in the system for 13 months. The social worker testified that, despite mother's section 388 petition and attachments, the department was still recommending termination of parental rights, concerned with mother's ability to maintain sobriety. Mother did have a stronger support system this time and had been accessible and communicative with the

7.

department throughout the case. Although the children stated that they wished to be adopted, they were not told there was a possibility that they might not see mother again.

Mother's NA/AA sponsor testified that mother grew more excited the longer she remained sober. The sponsor opined that mother had great potential for success. An aunt of mother's, who was a California state eligibility worker, described herself as part of mother's support system and opined that mother was doing increasingly well.

Mother testified to the various services she had completed and her renewed commitment to the church. She testified that she was now taking advantage of the various tools she was offered and stated she did not have a good sponsor last time. She had changed the places she frequented and kept her circle small. Mother was currently working as a housekeeper in a Marriott and a health aide for young people with disabilities, making her able to support her children financially. Mother described herself as motivated physically, mentally, and emotionally.

The children testified in the presence of only the juvenile court and the attorneys. Christian, age 16, testified that he wanted to go to college. While he enjoyed visits with mother, he had not seen her in a couple of months, due to Covid. He described his relationship with his mother as close and wished to return to her care. Christian stated that he knew what adoption entailed and stated that he was willing to be adopted if not returned to mother's care but would not want to be adopted if it meant he could not see his mother again. In that case, he would rather be in a guardianship. He described his close bond with both L.M. and Sebastian. Asked by the juvenile court what he would think if he was not adopted but his siblings were and he was separated from them, Christian responded that that would be "a really hard" choice.

Sebastian, age 14, testified that he missed his mother and wanted to see more of her. He also testified he would like to be adopted if he was not able to go back to his mother. He was not so sure if he wanted to be adopted if he was never able to see his mother again, as it would make him sad and very upset. The juvenile court carefully

8.

explained the difference between adoption and guardianship to Sebastian. Sebastian testified that he had a close relationship with his siblings. The juvenile court summarized Sebastian's testimony as "I love my mom. Never want to lose her. My preference is there but also never want to be back through what I've been through?" Sebastian agreed, stating, "That's correct."

L.M., in the third grade, testified that she had a good relationship with her mother, loved her, missed her and wanted to see her and go back with her. But even though she might not see her mother again, L.M. still expressed that she "kind of" wanted to be adopted. L.M. expressed not wanting to be adopted if it meant she and her brothers would be split up. If she could not return to mother, she would like to stay with the caregivers and still be able to see mother.

The juvenile court denied mother's section 388 petition, finding that 13 months of sobriety was not long enough after 25 years of drug use and a shrinking length of sobriety between relapses. The juvenile court also found that it would not be in the children's best interest to grant additional services and disrupt their stability.

The juvenile court found that all three children were specifically adoptable. It admitted that the children loved their mother, loved their visits with her, and she had provided "adequate structure, nurture, challenge and engagement." And when sober, she demonstrated "more than adequate abilities" to engage them each individually.

In addressing the children's responses to the question of adoption, the juvenile court found that L.M. equivocated a bit on the issue of adoption; Sebastian seemed to state that he could not choose between mother and having to go through "any of that all again"; and Christian wished to go back to mother if he could safely, otherwise to be adopted. Mother's counsel objected to the juvenile court's characterization of the children's testimony, stating that both Christian and Sebastian indicated that, if adoption meant not seeing mother, they did not want to be adopted.

The juvenile court then decided to again ask the children, this time in front of all the parties. The juvenile court asked Christian if he was telling the court he "flatout [did] not wish to be adopted" and rejecting that option, "or is it conditional?" After a delay, Christian replied, "I do want to go back home but I also want to be safe." The juvenile court responded:

> "So that's what I thought. You don't want to be adopted and keep the relationship with mom if mom can be safe with you and predictably sober and not experience this. If the Court decides otherwise you're willing to be adopted?"

Christian responded "yes."

The juvenile court then questioned Sebastian, who stated,

> "I do want my first choice to go back to my mother if I go back to my mother but if we're not able to go back with our mother I would just want to be able to stay with my siblings and —."

At this point, the juvenile court interjected and asked, "And keep your relationship alive with your mother?" Sebastian responded "yes."

The juvenile court declined to question L.M. further due to her age, stating it understood her previous testimony to be that, if possible, she would rather be with mother, but would leave it to the juvenile court.

The juvenile court went on to find that the boys were not totally rejecting adoption, but that the record was clear the children were bonded to mother and loved her.

The juvenile court then addressed mother stating that it understood that she was committed and had worked hard, she had developed a support system, she was employed, and appeared "totally sober," however, the juvenile court stated it "still must determine whether I believe the person in question has demonstrated ability to be geared emotionally stable and predictably secure through all sorts of stresses and despite your obvious efforts and courage." The juvenile court described mother's demeanor throughout the case as not "gathered and emotionally put together."

10.

The juvenile court then addressed the current care the children were receiving and noted that the children were all doing well in school and that the benefits of adoption were "huge, unmistakable." It found that the beneficial parent relationship exception was not proved, parental rights were terminated, and the children were freed for adoption.

**DISCUSSION**

I.      SECTION 388 PETITION

Mother contends the juvenile court abused its discretion when it denied her section 388 petition. We disagree.

Section 388 allows a parent to petition the juvenile court to set aside, modify, or change any prior order of the court. The petition must state in concise language any new evidence or change of circumstances that allegedly require the change of order. (§ 388, subd. (a)(1).) Mother's section 388 petition requested that the minors be returned to her care and the case dismissed. In the alternative, she requested that the children be returned with family maintenance, and if the court was not so inclined, to order mother reunification services and increase visitation. Mother alleged, as changed circumstances, completion of inpatient and outpatient programs, as well as completion of parenting classes, continued participation in mental health services, continued negative drug tests, stable housing and employment.

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child. [Citation.] The parent bears the burden to show both a legitimate change of circumstances and that undoing the prior order would be in the best interest of the child." (*In re A.A.* (2012) 203 Cal.App.4th 597, 611–612.)

"Not every change in circumstance can justify modification of a prior order. [Citation.] The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate. [Citations.] In other words,

11.

the problem that initially brought the child within the dependency system must be removed or ameliorated. [Citations.] The change in circumstances or new evidence must be of such significant nature that it requires a setting aside or modification of the challenged order." (*In re A.A., supra,* 203 Cal.App.4th at p. 612.)

Section 388 serves as an " 'escape mechanism' when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528.) It is not enough for a parent to show an incomplete reformation or that he or she is in the process of changing the circumstances which led to the dependency. "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability.' [Citation.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) "A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*Ibid.*) " 'A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent ... might be able to reunify at some future point, does not promote stability for the child or the child's best interests.' [Citations.]" (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206.)

"A petition for modification is 'committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established.' [Citations.]" (*In re A.R.* (2015) 235 Cal.App.4th 1102, 1116–1117.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' [Citations.]" (*Stephanie M., supra,* 7 Cal.4th at pp. 318–319.) " 'The

denial of a section 388 motion rarely merits reversal as an abuse of discretion.' [Citation.]" (*In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445.)

At disposition in October 2019, the juvenile court ordered that mother not be provided reunification services due to her previous dependency and failed drug treatment history. When mother filed her section 388 petition in January 2020, a day before the scheduled section 366.26 hearing, mother had, on her own, completed drug treatment programs, parenting classes, and participated in mental health treatment. The current section 300 petition was filed, in large part, because of mother's continued substance abuse.

At the hearing on the section 388 petition, the juvenile court found mother failed to make the requisite showing that her circumstances had changed. We agree.

While mother had completed drug treatment and was currently sober, her history of substance abuse dates back to at least 1999, as she admitted methamphetamine use at age 19. In February of 2008, Christian and Sebastian, then ages three and one, were removed from mother due to her substance abuse issue. The case was terminated one year later when mother was able to successfully reunify with the children. However, in January of 2015, mother had resumed methamphetamine use and the children were found living in unsafe conditions. Mother now had three children: Christian, Sebastian, and L.M., at the time, ages 10, eight, and four. The children were detained, and mother again offered substance abuse treatment. Services were terminated after 18 months and the children placed in a permanent plan living arrangement. They were later returned to mother in November 2017. The third and current dependency was initiated in June of 2019 for the same reasons: mother's continued substance abuse and the children living in unsafe conditions. Mother's current efforts, while commendable, at best demonstrated changing, but not changed, circumstances.

As noted by the juvenile court in its August 12, 2020, ruling,

13.

"We've been going through this for 12 years and half since February 11, 2008 …. And mom through taxpayer funding at a much younger age received services including comprehensive drug treatment services and represented herself, to the Court, and to her children really and to the world as sober and of adequately and safely caring for her children or she would have said so and she would not have reunified, but she did reunify."

And the juvenile court noted that this was not the first time mother had said things were different as "she said before in 2009, the first time around, where it was different, I'm sober. And in 2017 the second time around, where it was different, and she would maintain sobriety. [¶] So, the timeframe sobriety as of late got tighter and shorter."

Our conclusion that the juvenile court did not err in finding mother failed to establish changed circumstances obviates the need to address the children's best interests in the context of the section 388 petition. We find no abuse of discretion on the part of the juvenile court in denying mother's section 388 petition.

## II.    EXCEPTIONS TO ADOPTION

Mother also contends the juvenile court erred when it failed to find that three exceptions to adoption under section 366.26, subdivision (c)(1)(B) existed in this case.

The three exceptions relevant here are the beneficial parental relationship exception (§ 366.26, subd. (c)(1)(B)(i)), the child-objection exception (§ 366.26, subd. (c)(1)(B)(ii)), and the sibling relationship exception (§ 366.26, subd. (c)(1)(B)(v)). After concluding mother failed to prove any exceptional circumstances, the juvenile court terminated parental rights and ordered adoption for the children. While mother contends the court erred, we disagree.

When efforts at reunifying dependent children with their parents have failed, as they did here, the juvenile court must select and implement a permanent plan for the children in a section 366.26 hearing. (*In re Celine R.* (2003) 31 Cal.4th 45, 49.) "The express purpose of a section 366.26 hearing is 'to provide stable, permanent homes' for dependent children." (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 645.) At the hearing, the court has essentially three options: (1) terminating parental rights and freeing the

child for adoption, (2) appointing a legal guardian for the child, or (3) placing the child in long-term foster care.  (§ 366.26, subds. (b)(1), (3), (7); accord, *In re S.B.* (2008) 164 Cal.App.4th 289, 296.)  If "a child is found adoptable, the termination of parental rights and adoption is considered the best mechanism to ensure the child has 'a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.'  [Citations.]"  (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80.)  While guardianship is more stable than foster care, it " 'is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.'  [Citation.]"  (*In re Celine R., supra,* 31 Cal.4th at p. 53.)

At a section 366.26 hearing, once the juvenile court finds by clear and convincing evidence that the child is likely to be adopted within a reasonable time, the court is required to terminate parental rights and select adoption as the permanent plan, unless the parent shows that termination of parental rights would be detrimental to the child under one of several statutory exceptions.  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)  "Under section 366.26, the statutory preference is to terminate parental rights and order the child placed for adoption.  (§ 366.26, subd. (b)(1).)"  (*In re C.B.* (2010) 190 Cal.App.4th 102, 121.)  But there are statutory exceptions that " 'permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' "  (*Id.* at p. 122, fn. and italics omitted.)

### Parent-Child Relationship Exception

One such statutory exception to adoption applies where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  As the statutory language shows, there are two prongs to the exception: (1) regular visitation and contact; and (2) a beneficial parent-child relationship.  "Satisfying the second prong requires the parent to prove that 'severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be greatly harmed.

15.

[Citations.] A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.' [Citation.]" (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643, original italics.)

For the exception to apply, the parent-child relationship must "promote[ ] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated. [¶] Interaction between natural parent and child will always confer *some* incidental benefit to the child." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

Mother bears the burden of showing the exception applies. (*In re Noah G.* (2016) 247 Cal.App.4th 1292, 1300.) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*); see *In re Celine R., supra,* 31 Cal.4th at p. 53.)

The parent-child relationship exception "does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*Jasmine D., supra,* 78 Cal.App.4th at p. 1348.) "[A] child should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree but does not meet the child's need for a parent." (*Id.* at p. 1350.) Even a "loving and happy relationship" with a parent does not

necessarily establish the statutory exception.  (See *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419.)

In determining whether the relationship between parent and child is beneficial, we look to such factors as "(1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs."  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. omitted.)

We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parent-child relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child.  (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395; *In re Bailey J., supra,* 189 Cal.App.4th at pp. 1314–1315.)[2]  We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53; *Stephanie M., supra,* 7 Cal.4th at pp. 318– 319.)

Mother contends the parent-child relationship exception applies because her relationship and visits with the children were consistent and positive, and the children would be sad if they were not able to see her again.  While mother consistently visited the children, satisfying the first prong of the exception, she failed to identify any evidence which would compel a finding that termination of her parental rights would cause the children great harm.

Mother relies on several cases, which she claims are similar to her own situations. For instance, in *In re E.T.* (2018) 31 Cal.App.5th 68 (*E.T.*), twin minors were removed from the mother due to her history of mental health issues and drug addiction.  The

---

[2]    This question of what standard of appellate review applies to the beneficial parent-child relationship exception is currently before our Supreme Court.  (*In re Caden C.* (2019) 34 Cal.App.5th 87, rev. granted July 24, 2019, S255839.)

minors were returned after a year of reunification services and, after the mother self-reported having relapsed into drug use, she voluntarily placed the minors with the godparents who had earlier served as foster parents. (*Id.* at pp. 70–71.) The juvenile court bypassed reunification services to mother because she was previously provided services and was unsuccessful with reunification. (*Id.* at p. 71.) At the section 366.26 hearing, the juvenile court concluded the beneficial parental relationship exception did not apply and terminated the mother's parental rights, finding the minors had been living with their godparents for 24 months of their lives and only 22 months with the mother, some visits between the mother and the minors had been "difficult," and the minors' bond with the mother was not so strong that they could not be happy with their godparents. (*E.T., supra,* at p. 75.)

The appellate court reversed, concluding the mother's regular contact and visits with the minors, "coupled with [her] efforts during the dependency," demonstrated that the minors would benefit from continuing their relationship with the mother. (*E.T.*, *supra*, 31 Cal.App.5th at p. 76.) The court noted that, "despite denial of services, [the] [m]other continued to participate in programs designed to maintain her sobriety and make her a better parent. She has consistently tested negative for drugs, and during the dependency remained in drug treatment, took classes in life skills, parenting, cognitive behavior, criminal thinking, anger management and children of alcoholics and addicts." (*Id.* at p. 77.) The court further noted the minors would sometimes act out following visits but the mother provided them with comfort and affection and was able to ease their fear and anxiety, concluding the minors were " 'very tied to their mother' " and "terminating their familial relationship would cause them great harm." (*Id.* at pp. 76–77.)

We find *E.T.* distinguishable from the situation here. Like the mother in *E.T.,* mother also relapsed into drug use and took it upon herself to get into treatment. However, this was mother's third time doing so. Each time mother relapsed the children had to be placed into foster care. This time the children expressed concern about mother

being able to remain sober. They also appeared to thrive with their prospective adoptive parents and even chose to miss some visits with mother in order to participate in other activities.

Mother also relies on *In re S.B., supra*, 164 Cal.App.4th 289 in support of her position. In *In re S.B.*, the father lost custody of his child following his arrest on drug-related charges. The child was placed with her maternal grandparents. (*Id.* at p. 293.) Following the change of custody, father visited the child regularly and complied with every aspect of his case plan. (*Id.* at p. 298.) At the section 366.26 hearing, the juvenile court concluded that, while the child and father had a moderately strong relationship, it was more peer-like than parental, and the child turned more to her grandparents as parental figures. (*Ibid.*) It determined that while the father and child shared an emotionally significant relationship, it did not rise to the level required by the beneficial relationship exception. (*Ibid.*)

The appellate court in *In re S.B.* reversed, holding there was no evidence to support the court's finding that the father did not have a significant parental relationship with the child. (*In re S.B., supra,* 164 Cal.App.4th at p. 301.) The court noted that the father was the primary caregiver for three years prior to losing custody. The child continued to display a strong attachment to the father after he lost custody; she was unhappy when visits ended and tried to leave with him. (*Id.* at p. 298.) The social worker reported that the father " 'demonstrates empathy and the ability to put himself in his daughter's place to recognize her needs.' " (*Id.* at p. 294.) The social worker stated, " 'It pains the Agency not to be able to reunify [the father] and his daughter ... because of his consistent efforts to alleviate and or mitigate the reasons his family was brought to the attention of the court.' " (*Ibid.*) The court concluded that a child could not have such a "significant attachment to a parent without the parent's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation." (*Id.* at pp. 298–299.) The court noted that the beneficial relationship exception did not require day-to-day

19.

contact between the child and the parent, or a primary attachment to the parent. (*Id.* at p. 299.) Thus, the only reasonable inference was that the child would be greatly harmed by the loss of her relationship with her father. (*Id.* at p. 301.)

Mother suggests that a different result is required by *In re S.B.,* because the relationship exception does not turn on whether a child has a "primary attachment" to the parent. However, the same appellate court that decided *S.B.* subsequently stated in another case: "The *S.B.* opinion must be viewed in light of its particular facts. It does not, of course, stand for the proposition that a termination order is subject to reversal whenever there is 'some measure of benefit' in continued contact between parent and child." (*In re Jason J.* (2009) 175 Cal.App.4th 922, 937.) The same court reiterated the exceptional nature of the *S.B.* decision in *In re C.F.* (2011) 193 Cal.App.4th 549, 559, stating: "[W]e once again emphasize that *S.B.* is confined to its extraordinary facts. It does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact.... [C]ontact between parent and child will always 'confer some incidental benefit to the child,' but that is insufficient to meet the standard."

Like the juvenile court here, we have no doubt that mother loved her children and that their time together was beneficial. But that does not mean it was so beneficial as to outweigh the benefits of adoption, and it did not render mother's relationship to the children "parental."

Finally, mother also relies on *In re Scott B.* (2010) 188 Cal.App.4th 452, for the proposition that her visitation provided continuity and stability in the children's lives. In *Scott B.*, the child was nine years old when he was placed in foster care and 11 years old when his mother's parental rights were terminated. He had lived with his mother his whole life prior to removal. (*Id.* at p. 471.) The child suffered from attention deficit hyperactivity disorder and autism, needed special education services, had behavior problems at school, had problems interacting with his peers, and had bladder control

20.

issues. (*Id.* at pp. 455–456.) When the child learned he might be adopted, his behavior regressed to growling and biting. (*Id.* at p. 458.) He was adamant at the section 366.26 hearing that he did not wish to be adopted. (*Id.* at p. 464.) The child stated that if his foster parent adopted him, he would run away because he wanted to live with his mother. (*Id.* at p. 466.) There, the child's court appointed special advocate repeatedly stated in her reports that the mother and the child have a very close relationship and it would be detrimental to the child for the relationship to be disrupted. The child had emotional instability and repeatedly insisted that his preference would be to live with the mother. (*Id.* at p. 471.) The appellate court held these reasons were compelling to find that termination of parental rights was detrimental to the child and reversed the juvenile court's order terminating parental rights. (*Ibid.*)

We find no material similarity between the instant case and *Scott B.* Mother alleges the children would be greatly harmed if they were unable to see mother again, but no evidence of that was presented at the section 366.26 hearing. Instead, while the children understandably related that they might be sad if they no longer saw mother, there was ample evidence that the children had formed a positive and stable attachment to their prospective adoptive placement that allowed them to thrive. And while they would prefer to be able to continue to see mother, they were not opposed to adoption.

There is clear and convincing evidence that the facts of the instant case fall short of the evidence required to establish that the children would be greatly harmed by termination of mother's parental rights.

### Older Child Objection Exception

Mother also contends the juvenile court erred in terminating her parental rights because Christian and Sebastian, both over the age of 12, did not agree to be adopted, as they wished to continue having a relationship with her.

After a court finds a child 12 years old or older adoptable, the court can determine whether the child-objection exception applies under section 366.26, subdivision

(c)(1)(B)(ii). This exception applies if "[a] child 12 years of age or older objects to termination of parental rights" (*ibid.*) and the court decides this is "a compelling reason for determining that termination [of parental rights] would be detrimental to the child" (*id.*, subd. (c)(1)(B)). Here, after finding that the children were likely to be adopted, a decision not disputed here, the court addressed the child-objection exception and found it did not apply because Christian and Sebastian did not unequivocally object to adoption. Again, it is mother's burden of proving the objection. (*In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1335.)

The juvenile court spent quite a bit of time questioning both Christian and Sebastian and, while their answers reflected an internal struggle and hesitancy, it did not reflect a refusal to be adopted. Both stated that, if they could not be returned to mother, they would be open to adoption, as their return to mother's care was conditional on her remaining sober and not having to experience being removed from her custody again. Minors' counsel also believed that the relationship with mother did not outweigh the children's need for permanence and stability, arguing that there was no exception that supported a compelling reason for determining that termination of parental rights would be detrimental to the children.

Christian and Sebastian's mixed emotions to adoption is understandable at their age. As aptly noted in one treatise, "the child may want to be adopted or be willing to be adopted, yet have reservations, sending an unclear or mixed message. This is common, since it is frequently very difficult for children to make such decisions [citation]." (Seiser & Kumli, Cal. Juvenile Courts Practice & Procedure (2020 ed.) § 2.171[5][b][iii], p. 2-682.) While Christian and Sebastian had some reservations about adoption, they did not object to adoption by the prospective adoptive parents and both expressed a desire to continue to be together as a sibling group.

While mother argues that the juvenile court may not terminate parental rights if a child 12 years or older objects, that is not the whole of the statutory exception. The

language of section 366.26, subdivision (c)(1)(B)(ii) clearly provides an exception to termination of parental right if a child 12 years or older objects to the termination of parental rights, but only if the juvenile court "finds a compelling reason that termination would be detrimental to the child due" to that circumstance. Here, however, for reasons stated above, the juvenile court did not find that objection to be a "compelling reason" to terminate mother's parental rights. We find no error on the part of the juvenile court.

*Sibling Relationship Exception*

Section 366.26, subdivision (c)(1)(B)(v) provides for an exception to termination of parental rights if it would cause substantial interference with a sibling relationship, balancing the child's sibling relationship with the benefit of being adopted. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.) The exception focuses on the child for whom adoption is being considered. (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) As argued by mother, if this court decides that Christian and/or Sebastian's objection to termination of parental rights was meritorious, we would then need to address the issue of the sibling relationship exception as it pertained to L.M.

We need not discuss this issue further. First, we have rejected mother's other arguments that her parental rights must be reinstated. And second, there was no evidence in the record that the siblings were at risk of being separated.

III.    THE INDIAN CHILD WELFARE ACT

Mother's final claim is that the juvenile court's order terminating her parental rights must be reversed because ICWA inquiry and notice was incomplete, as there was inadequate inquiry of mother, Christian's father, and extended family. We disagree.

*ICWA Purpose and Requirements*

ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family. (25 U.S.C. § 1902; see *In re Isaiah W.* (2016) 1

23.

Cal.5th 1, 7–8; *In re W.B.* (2012) 55 Cal.4th 30, 47; *In re S.B.* (2005) 130 Cal.App.4th 1148, 1163 [ICWA does not apply to emergency removal and placement of children].) When ICWA applies, a state court may not, for example, make a foster care placement of an Indian child or terminate parental rights to an Indian child unless the court is satisfied "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (25 U.S.C. § 1912(d); Welf. & Inst. Code, § 361.7, subd. (a); see *In re K.B.* (2009) 173 Cal.App.4th 1275, 1288 ["Active efforts required by ICWA are 'timely and affirmative steps ... to remedy problems which might lead to severance of the parent-child relationship.' "].) Prior to placing an Indian child in foster care, the court must also make "a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (25 U.S.C. § 1912(e); Welf. & Inst. Code, § 361.7, subd. (c).)

If an Indian child is removed from a foster care home, a subsequent placement must be in accordance with ICWA, unless the child is returned to the parent. (25 U.S.C. § 1916(b); Welf. & Inst. Code, § 224, subd. (b).) The Indian child, the parent, and the Indian child's tribe have the right to intervene in any "proceeding for the foster care placement of, or termination of parental rights to, an Indian child" (25 U.S.C. § 1911(c)), and can petition the court to invalidate any foster care placement of an Indian child made in violation of ICWA (25 U.S.C. § 1914; Welf. & Inst. Code, § 224, subd. (e)).

Central to the protections ICWA provides is the determination that an Indian child is involved, and federal regulations implementing ICWA require that state courts "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child." (25 C.F.R. § 23.107(a).) For these purposes, an " 'Indian child' " is a child who (1) is "a member of an Indian tribe," or (2) "is eligible for membership in an Indian tribe *and* is

24.

the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subd. (a) [adopting federal law definition].)

The court must also "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (25 C.F.R. § 23.107(a).) Under California law, the court and county child welfare department "have an affirmative and continuing duty to inquire whether a child," who is the subject of a juvenile dependency petition, "is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W., supra,* 1 Cal.5th at p. 9; Cal. Rules of Court, rule 5.481(a)[3].)

The juvenile court must ask the participants in a dependency proceeding upon each party's first appearance "whether the participant knows or has reason to know that the child is an Indian child" (§ 224.2, subd. (c)), and "[o]rder the parent ... to complete Parental Notification of Indian Status ([California Judicial Council] form ICWA-020)." (Rule 5.481(a)(2)(C), italics omitted.)

*Background*

The report prepared for the detention hearing stated that the ICWA did not apply as mother had reported she did not have any Native American ancestry and "[a]ccording to previous records from Fresno County Juvenile Dependency Court, on July 8, 2015, ICWA was found to be not applicable on behalf of the children, Christian, Sebastian and L.M." However, at the detention hearing June 13, 2019, mother had completed a parental notification of Indian status form indicating that she might have Pascua Yaqui and Cherokee heritage, which was noted by the juvenile court. None of the children's fathers were present at the hearing, but counsel for presumed father of Christian, Chase P., was present. In noting mother's recent ICWA-020 form, the juvenile court stated that the ICWA "may be applicable to these proceedings for reasons the Court described," and that

---

[3]    All further references to the rules are to the California Rules of Court unless otherwise stated.

it had to "check in with dad to revisit the issue and any new information with mom now said Yaqui and Cherokee." There is no ICWA-020 form in the record before us for Chase P., but in a later motion (September 24, 2019) to declare the ICWA inapplicable, the department stated that Christian's presumed father, Chase P., "has also reported that he may have Indian heritage and that he may be of the PASCUA YAQUI TRIBE." (Boldface omitted.)

The notice of child custody proceeding for Indian child (ICWA-030), which was sent to the Cherokee and Pascua Yaqui Tribes, lists mother's name and birthdate and states she may be Cherokee and/or Pascua Yaqui through her father. Mother's biological father and mother are both listed by name and birthdate. Also listed are mother's biological grandmother and grandfather on her mother's side, by name and birthdate, but there is no information on mother's biological grandmother and grandfather on her father's side, the side through which she was claiming Indian heritage. Maiden names are listed for all females.

As for Chase P., the ICWA-030 form lists his name, address, birthdate, as well as his claim of Indian heritage through the Pascua Yaqui on his mother's side. Chase P.'s biological mother is listed by name and birthdate, as is his biological father. Also listed are Chase P.'s biological grandmother and grandfather on his mother's side, with name and birthdate. Again, maiden names for the females are listed.

Under Chase P.'s name on the ICWA-030 is the following note:

"On 7/11/19 [mother] informed DSS ICWA Liaison that Fa1 – Chase P[.] has mentioned in the past possibly having Native American ancestry with the Yaqui Tribe. A Parental Notification of Indian Status is not attached due to Mr. P[.]'s incarceration. ICWA notice will be sent to Yaqui on behalf of Mr. Chase P[.]. [Mother] informed ICWA Liaison she had no information for Mr. P[.]s family nor on his lineage. Familial genealogy is used from CMS/CWS from prior information that was entered for Mr. P[.]. On 6/11/2019 ER Social Worker attempted contact with State Facility as to inform Mr. P[.] of the Juvenile Dependency Court hearing, leaving a telephonic message. On 6/25/2019 Family Finding was initiated for

paternal family members for minor Christian P[.] on behalf of Mr. Chase P[.]. As of this date, no family members have been located or come forward."

The department mailed the ICWA-030 to mother, Chase P. and the Bureau of Indian Affairs, the Cherokee Nation, the United Keetowah Band of Cherokee Indians in Oklahoma, the Eastern Band of Cherokee Indians, and the Pascua Yaqui Tribe on July 22, 2019. Proof of Certified Mail receipts were received as to all parties. As of September 24, 2019, responses were received from the Eastern Band of Cherokee Indians and the Pascua Yaqui Tribes that none of the minors were biological children of an enrolled member or eligible for membership in the tribe. No responses were received from the Bureau of Indian Affairs, the Cherokee Nation, or the United Keetowah Band of Cherokee Indians in Oklahoma.

At the October 22, 2019, jurisdiction and disposition hearing, the juvenile court granted the department's motion to declare the ICWA inapplicable. Before doing so, the juvenile court revisited the issue and addressed mother specifically about her disclosure of Indian heritage in her previous dependency cases. She stated that she had only mentioned Yaqui in the earlier dependency but added Cherokee "this time" because her father told her "this year" his "sisters" or "aunts" (mother was unclear) were Cherokee. The juvenile court pressed mother further, asking exactly what she had been told. Mother said she had not gotten any details because it had been years since she had seen "them" and stated her father "wasn't in" her life. The juvenile court described it as "So you've heard. Yes, we have Cherokee ancestry but no details." Mother replied, "Yeah." Mother's counsel stated she did not have any additional information. Counsel for the department noted that the ICWA-030 included that mother's father alleged he was Cherokee and Yaqui and that both tribes were noticed, and responses had been received from the Cherokee Nation and the Pascua Yaqui "that the family are not ICWA." The juvenile court then stated, "I think we're okay as far as information" and asked if mother's counsel agreed, which she did.

The Cherokee Nation subsequently responded, in a letter dated October 22, 2019, that the children were "not … Indian … children" in relation to the Cherokee Nation.

The subsequent section 366.26 hearing report filed by the department states, inter alia, that "[o]n October 22, 2019, the undersigned completed a new ICWA inquiry at which time [mother] reported that she does not have any Native American Ancestry" and that the juvenile court found the ICWA inapplicable on that date.

*Analysis*

The record here contains substantial evidence of proper notice to the Cherokee and Pascua Yaqui tribes. The department provided notices by certified mail to the tribes containing information about mother, Chase P. and various direct relatives from whom both claim Indian ancestry.

Yet, mother contends that the juvenile court did not ask her until the October 22, 2019 ICWA hearing why she was claiming Cherokee heritage when she had not claimed it in earlier dependency cases and, once she explained why, it failed to ask her for her father's contact information or whether the department had inquired of mother's father himself. Mother contends the notices were deficient because they excluded all information about father's "aunts" or "sisters," and the department could have gotten this information from her father or other relatives. She also contends the department could have gotten additional information about Chase P.'s relatives but failed to do so.

We are not persuaded by mother's reliance on *In re A.G.* (2012) 204 Cal.App.4th 1390, for the proposition that reversal is required here. In *In re A.G.*, the social services agency admitted it violated ICWA's inquiry and notice requirements. It made no effort to interview family members who were readily available and active participants in the dependency proceedings. (*Id.* at p. 1393.)

Here, there is no such admission by the department. In addition, it is unlikely that information about mother's father's "aunts" or "sisters" would establish Indian ancestry for mother's children when the information on mother's father did not. And the record

28.

shows that, when asked, mother's counsel agreed that the information provided by the department and sent to the tribes was "okay." Finally, according to the department's section 366.26 hearing report, the social worker completed a new ICWA inquiry of mother on October 22, 2019, in which she reported that she did not have any Indian ancestry.

As for Chase P., the ICWA had also been previously found not to apply as to him, presumably in the 2015 dependency case. That case is not part of the record before us and we have no evidence concerning the inquiries the department made in that case or what information the ICWA notice included. And even if we had that record, we would still have no evidence showing whether different information about family members might be available today or how the tribes might have changed their eligibility criteria over the years since that previous case. However, what we do know is that Chase P. was asked to respond to the department's request for ICWA information and failed to do so.

As an aside, we also note that nowhere in the proceedings is Chase P. considered to be Christian's biological father but is instead always referred to as his presumed father. The record stated that Chase P. never signed a declaration of paternity as to Christian and was not listed on his birth certificate. The ICWA is applicable only to biological parents. (25 U.S.C. § 1903(4); See, e.g., *In re C.A.* (2018) 24 Cal.App.5th 511, 520 [ICWA's notice provisions did not apply to presumed father with no biological or adoptive relationship to the child].)

If mother had raised the ICWA notice issue further in the juvenile court, she could have subpoenaed department employees and questioned them about their efforts to elicit the information she contends is lacking. In that event, the department could have introduced additional evidence to show that it had made an adequate inquiry. However, mother did not do so, and the department now lacks that opportunity. At this point, mother must take the record as she finds it. (*In re Charlotte V.* (2016) 6 Cal.App.5th 51,

58.) The record reveals substantial evidence of ICWA compliance. We therefore conclude that mother has not demonstrated any prejudicial error.

## DISPOSITION

The orders of the juvenile court are affirmed.