Filed 9/17/24  In re A.B. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.B., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E083386 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ2100119) |
| v. | OPINION |
| T.B., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge.
Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and
Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Prabhath Shettigar,
Deputy County Counsel, for Plaintiff and Respondent.

1

The juvenile court terminated defendant and appellant T.B.'s (mother) parental rights as to A.B. (minor, born December 2012). On appeal, mother contends the court improperly delegated visitation decisions to minor and abused its discretion in terminating visitation. Mother additionally maintains the juvenile court and plaintiff and respondent, the Riverside County Department of Public Social Services (the department), committed reversible error by failing to comply with their duty of inquiry with respect to the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.). We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On January 22, 2021, the department received an allegation regarding general neglect; the reporting party indicated that while mother and minor were participating in virtual school, they began arguing. Mother grabbed minor by his arm and pushed him away. The next day, the department received a second referral. The reporting party indicated that mother and minor were again arguing during virtual school: "It was reported the mother was seen lunging at [minor] and standing in [*sic*] his face while he was sitting down." On January 29, 2021, the department received a third referral; the reporting party indicated that during virtual school, mother started yelling at C.G., minor's younger sibling. Mother screamed, "'Shut the fuck up [C.G.], sit your ass down, you are a fucking liar, you are always to blame, I saw you fucking do it.'" The reporting party then heard a loud slap.

The social worker met with mother on February 1, 2021. Mother admitted all the allegations. Contradictorily, the social worker reported, "mother admitted to cussing at

2

the children but denied physical discipline." Mother said minor was autistic and has behavioral issues; she said she struggled disciplining him. Mother identified A.D. as minor's father.

Mother reported having anxiety and bipolar I disorder; she was seeing a psychiatrist but was not taking medication because she was pregnant. Mother said she had been "5150'd years ago."

Minor admitted behavioral problems including breaking his Chromebook. He reported that he would get in trouble often, and that his mother constantly yells at him. He denied being physically disciplined.

The social worker provided mother with referrals to counseling agencies, Medi-Cal, and anger management classes. The social worker requested mother provide proof of enrollment by February 5, 2021.

On February 5, 2021, mother reported having enrolled in services; however, when asked for documentation, mother requested more time and abruptly hung up. On February 9, 2021, the social worker conducted a surprise visit at the home. Mother said she thought the case had been closed. She said the offices for the referred services were closed and would not provide her with verification of her appointments. On February 16, 2021, the social worker texted mother asking for confirmation of enrollment in therapy; the social worker received a response indicating the social worker had the wrong number; however, it was the same number the social worker had used to successfully communicate with mother previously.

Mother denied having any Native American ancestry. On May 21, 2018, A.D. had "petitioned the Court providing [] at-home paternity test results showing that he is not the biological father of" minor. "On June 25, 2018, [a] Court found [A.D.] waited too long to dispute the paternity . . . ." A.D. denied any Native American ancestry. Mother denied knowing the identity of minor's biological father.

On February 26, 2021, the social worker made a surprise visit to the home. Mother was not there. The maternal grandmother was watching the children and invited the social worker inside. C.G. told the social worker mother became upset with him, "picked him up off the couch, and threw him on the floor." Minor admitted seeing mother throw C.G. Minor also told the social worker that mother "put her hands around his neck, and pushed him against the wall."

On March 2, 2021, the social worker took the children into custody pursuant to a protective custody warrant. During the drive to the office, C.G. disclosed that mother had punched him in the ribs for having a "'potty accident.'"

Mother had a prior dependency history, which included six prior referrals, all of which were deemed unfounded. Mother's criminal history included a battery charge and numerous instances in which she was the victim of domestic violence. Mother had three prior psychiatric holds.

On March 4, 2021, the department filed a Welfare and Institutions Code section 300[1] petition as to minor alleging mother had untreated mental health issues (b-1), used

---

[1] All further statutory references are to the Welfare and Institutions Code.

inappropriate physical and verbal discipline (b-2), failed to provide minor with proper mental health care (b-3), had a criminal history (b-4), had engaged in domestic violence in the presence of the children with C.G.'s father (b-8), and that the family had a significant history with the department (b-9).

The juvenile court detained minor at the hearing on March 5, 2021. Mother filed a Judicial Council Forms, form ICWA-020, reflecting she had no known Indian ancestry. The court found ICWA did not apply to the proceedings. Mother filed a parentage form reflecting minor's father was unknown. The court ordered A.D. to undergo paternity testing.

In the jurisdiction and disposition report filed March 23, 2021, the social worker requested a 30-day extension to obtain paternity results. Both mother and A.D. again denied any Native American ancestry. The children denied any physical discipline by mother. Both children reported domestic violence between mother and C.G.'s father. Mother consistently visited with the children twice weekly. The court granted the department's request for a continuance.

In the April 22, 2021, addendum report, the social worker recommended the court find the allegations in the petition true, remove the children from mother's custody, and grant mother reunification services. The social worker received the results of A.D.'s paternity test reflecting a 99.99 percent probability he was not minor's father. The social worker spoke with the maternal grandparents; the maternal grandmother reported that mother physically abused the children. Minor reported that mother choked the maternal

grandmother, but denied she physically disciplined him. C.G. reported that mother would kick him; when she would discipline him, it was "'painful.'" He reported witnessing mother choking minor. C.G. said mother would punch both of them.

At the hearing on April 27, 2021, the court found that A.D. was not the biological father of minor and dismissed him from the petition. On April 27, 2021, the department filed a first amended section 300 petition removing allegations pertaining to A.D. and modifying the b-1 allegation to read that mother had "a history of" mental illness, rather than "untreated" mental health issues.[2] In an addendum report filed May 14, 2021, the social worker reported that mother's visitation was increased to two hours, twice weekly due to her participation in services and utilization of the skills she learned in services during visitation.

On May 19, 2021, the court found the allegations in the first amended petition true, removed the children from parents' custody, and granted mother reunification services.[3]

From June 25 to 27, 2021, the children had an unsupervised weekend visit with mother. On July 2 to 5, 2021, the children had a second unsupervised weekend visit with mother. They were placed in mother's care on July 5, 2021. On July 7, 2021, law enforcement placed mother on an involuntary psychiatric hold due to threats of suicide.

---

[2] On May 19, 2021, the court struck A.D. "from the petition in its entirety, if that hasn't been done already."

[3] The court denied C.G.'s father reunification services because, after a diligent search, the department had been unable to locate him. (§ 361.5.)

On September 30, 2021, mother was placed on another involuntary psychiatric hold after she "took pills and tried to commit suicide." At the time, the children were in the home of the maternal grandmother.

On October 8, 2021, the department took all the children, including J.D. (born August 2021), into custody pursuant to a protective custody warrant. In a section 387 supplemental petition filed October 13, 2021, the department alleged the previous disposition had not been effective because mother continued to have ongoing mental health issues and suicidal ideation resulting in her hospitalization when the children were in her care (s-1).

On October 13, 2021, the social worker asked mother if she had Native American ancestry; mother responded, "that she was told she does, but she asked her mother and she is not sure." The maternal grandmother "said that she was told she was Native American, but she is not sure, and she is not registered. She disclosed she thinks it could be the tribe Eagle Blackfoot, something like that."

On October 14, 2021, the court detained minor on the supplemental petition. The court noted, "And I believe on the mother's side, there was, I believe, [Blackfeet] Indians . . . that were identified in the report, as well, so I think it's something that the Department may need to look into." The court directed the department to make further inquiries and found ICWA may apply.

In the November 1, 2021, jurisdiction and disposition report, the social worker recommended the court find the allegation in the supplemental petition true, remove

7

minor from mother's custody, grant mother reunification services, and find that ICWA may apply. On October 25, 2021, the social worker asked mother if she had Native American ancestry. Mother responded that "she is not a registered tribal member. She added that she thought she may have Ancestry but does not recall the tribe or the percentage of her heritage." Mother had been visiting minor weekly. The foster parent reported no concerns.

On November 2, 2021, the social worker sent an ICWA email inquiry containing mother's familial information to the Blackfeet Tribe of Montana and the Indian Bureau of Affairs. In an addendum report filed November 19, 2021, the social worker reported "mother admitted during an interview on October 25, 2021, that she does not feel she can care for [minor] . . . and would like for him to [be] 'signed over' to her stepfather as [minor] does well over there."

In the December 29, 2021, status review report, the social worker recommended mother continue to receive reunification services. On November 9, 2021, mother and J.D's father were involved in a domestic violence incident resulting in police intervention. On February 8, 2022, the department filed a response from the Blackfeet Tribe reflecting that minor did not qualify for tribal membership.

In an addendum report filed February 17, 2022, the social worker reported that minor had been engaging in negative behaviors after visitation with mother; minor would say "things like 'I hate her' or 'this is all her fault,' while kicking the back of the car seat." Minor's therapist said minor would get tense and avoid the topic of how his visits

8

with mother were going. During a visit on January 24, 2022, mother insinuated that she only wanted to reunify with her two youngest children; she had plans for the maternal uncle to care for minor. Mother remained consistent with visitation.

At the hearing on March 11, 2022, the court found ICWA did not apply. The court found the s-1 allegation true, removed minor from mother's custody, and granted mother reunification services.

In the 12-month status report filed May 5, 2022, the social worker recommended the court terminate reunification services. Mother denied having Native American ancestry. The social worker spoke with minor's resource parent who reported an incident wherein minor tore up the principal's office and pushed a class aid against the wall. When asked to write an apology letter, minor said "'well my mom always hits us, she never apologizes.'" "The resource parent stated that the school aid has someone that loves her and would be upset that someone hurt her. [Minor] then explained 'well my mom hurts us.'" The social worker spoke with minor's therapist who reported that minor expressed that "'mother puts hands on him and hits him.'" Minor wanted to visit C.G. but not mother.

Mother visited with minor once weekly for three hours. On May 4, 2022, minor left a message for the social worker saying he did not want to visit with mother that day. The social worker called mother and explained that minor cancelled the visit. A letter from minor's therapist explained that "changes in visitations have increased behaviors

9

and . . . conflict with family appears to be an obstacle for [minor] to meet his treatment goals."

At the hearing on May 5, 2022, minor's counsel requested the court find visitation with mother detrimental to minor: "He's been having behavioral issues at school as a result of pending visitation with his mother." The department joined in minor's counsel's request. The court noted, "at this point it's clear to this Court that it is detrimental for both boys to have visitation with their mother." The court determined that mother would be allowed to write minor and minor could write back if he wanted.[4]

In an addendum report filed June 15, 2022, the social worker recommended mother's visits be reduced to once monthly and that minor's wishes be taken into consideration. The social worker also recommended the court authorize family therapy between mother and minor, with minor's consent to participate. Minor and C.G. had refused to participate in any further supervised visits with mother. Mother was pregnant with a fourth child. In another letter from minor's therapist, the therapist wrote that minor "appeared to make progress with his treatment goals after limiting visitations with . . . mother as evident by reduce[d] sleep difficulties and anger outbursts. [Minor] will randomly disclose physical and verbal abuse he experienced by his mother and abuse seen towards his brothers . . . after limited visitations."

At the hearing on June 20, 2022, minor's counsel noted "that even though Mother has completed her case plan, she's not shown that she's truly benefited from her services.

---

[4] Mother had no further contact with minor.

She has continued to make statements to the children that are not appropriate. And at this point in time neither of these children wish to visit with their Mother, as it is too traumatic for them."

The court found ICWA did not apply, terminated mother's reunification services, and set the section 366.26 hearing. The court found that visitation between mother and the children would be detrimental. The court authorized family therapy between the children and mother once the children were ready.

On August 22, 2022, minor's foster parent filed a de facto parent request noting that minor had lived with her since December 16, 2021.[5] On June 7, 2022, mother again denied any Native American ancestry. At the hearing on February 2, 2023,[6] the court granted the caregivers de facto parent status. On June 1, 2023, the department filed a response from the Blackfeet Nation reflecting that none of mother's children were eligible for membership and that they did not qualify as an "Indian Child."

In the July 19, 2023, section 366.3 report, the social worker recommended the court find ICWA did not apply. The social worker recounted the ICWA history of the case and reported that on January 25, 2023, "mother reported there was Native American descent in her family. She stated her cousin . . . reported to have 1% Native American [ancestry], but it was unknown what tribe. She then stated her mother had stated they did have Native American descent, but she was unsure what tribe."

---

[5] The reports reflect the placement occurred on December 20, 2021.

[6] The court previously and subsequently ordered numerous continuances in this case based on issues not entirely relevant here.

On January 26, 2023, the maternal uncle reported he did not know whether the family had any Native American ancestry. On June 27, 2023, mother stated that she had Indian heritage but wasn't sure what tribe, though her mother told her it was Blackfeet. "When asked if anyone in her family was registered with the Blackfoot tribe, she stated she did not know."

On August 2, 2023, the parties, including mother, stipulated that the court should adopt the recommendations in the section 366.3 report and make them the findings and orders of the court. In the addendum reports filed December 4, and 13, 2023, the social worker recommended the court terminate mother's parental rights.

At the hearing on December 18, 2023, the court adopted the department's proposed findings and orders, found minor adoptable, and terminated mother's parental rights as to minor. Minor's counsel observed that in recommendations, "There's no language in the form for any alleged fathers." The court reviewed the recommendations and ordered "the parental rights of Mom and all unknown fathers are terminated." The court clerk requested the recommendations be amended to contain an attachment to include the unknown father. The court then discussed the case with counsel off-the-record.

Upon recall of the case, mother provided information as to minor's possible biological father.[7] The department requested the purported biological father's information and a 45-day continuance to provide notice.

The court ordered mother to provide counsel "with all information about this alleged father before she leaves today. Frankly I don't think it's real. This case has been going on for two years and Mother has never come forward with a name until the day that we are set to terminate parental rights. I believe it's a pure case of gamesmanship, and Mother has done nothing to help her case today." The court continued the matter.

In the report filed January 18, 2024, the social worker recommended the court terminate the parental rights of mother, the newly identified purported father, and any unknown fathers. The social worker noted that on January 9, 2024, "mother stated that she has Native American ancestry, but she does not know the name of the tribe. Based on the mother's lack of information regarding her Native American ancestry, the Department cannot follow up further investigation regarding the ICWA as to the case at this time of this report writing." The social worker recommended the court find ICWA did not apply to the case.

The social worker reported that mother gave the department the name of a possible father whom she said she met in Moreno Valley; however, she did not know his birthdate.

---

[7] The minute order does not reflect that the court terminated mother's parental rights as to minor. It would appear that the court intended to vacate its order terminating mother's parental rights and continue the matter so that the department could make inquiry of the purported father and amend the recommendations to include any alleged or unknown fathers. However, the court never orally vacated the order terminating mother's parental rights.

Mother gave the social worker the name of "the possible paternal grandmother" so she could make further inquiry. The social worker spoke to the purported paternal grandmother who informed her that the purported father had passed away on March 4, 2020.

At the hearing on January 31, 2024, mother's counsel objected to termination of her parental rights as to minor: "I'll just very quickly restate that she does feel that the current caregiver has sabotaged [minor's] ability to reunify with Mother . . . ."

The department noted, "As to ICWA for [minor], we did file an ICWA noticing document on June 1st, 2023 that included a response letter from the Blackfoot tribe. I know the report states that Mother recently noted she has Native American ancestry. This was on January 9th, 2024, but she doesn't know the name of the tribe." "And as far as the [purported] father that was mentioned at the last hearing . . . the social worker did speak to who we believe is the [purported] paternal grandmother on January 5th, 2024, and she stated her son had passed away on March 4th, 2020. The social worker requested a copy of the death certificate. We have not been able to obtain that. For that reason, we are requesting to terminate his parental rights as well."

The court found that there was no credible evidence that ICWA applied to the case. After an off-the-record discussion, the court stated, "In light of the fact that the [section 366].26 JV-320 in the Court's opinion is incomplete in that it does not address why [the purported father] was denied services—it states that he's deceased, but there's no mention of that in the narrative, there's no attachment showing proof of his death, and the Court

14

believes there's a significant hole or absence of facts in the JV-320 that needs to be addressed. [¶] So we either need a death certificate to attach to the JV-320 supporting the fact that [the possible father] is deceased, or we need to have a discussion about removing it . . . altogether in light of the fact that he wasn't on the petition, but it's not very clean. [¶] And in light of the fact that Mother is challenging [termination of parental rights], I don't want to come back in three or four months with the Appellate Court saying, 'Why did you not do this right the first time?'" The court continued the matter again.

At the hearing on February 23, 2024, mother's counsel again objected to termination of parental rights: "I would submit on my previous objections that I stated at the previous hearings regarding Mother believing [minor's] caregiver has sabotaged any chance of reunification for [minor] and the mother, and Mother is just asking for another chance to reunify with [minor]."

The Court noted "that in this case [possible father] has been deceased and is deceased." The court terminated mother's parental rights to minor. Mother appealed the February 23, 2024, order terminating her parental rights.

## II. DISCUSSION

### A. Visitation.

Mother contends that over the course of two years while the section 366.26 hearing was pending, the juvenile court erred in delegating visitation decisions to minor and in improperly denying her visitation, which infringed on her ability to argue the

15

beneficial relationship exception to termination of parental rights. We hold that we lack jurisdiction to address the issue because mother failed to timely file a notice of intent to file a petition for extraordinary writ from the order terminating her reunification services and setting the section 366.26 hearing, the hearing at which the court denied mother visitation.[8] Even assuming mother could raise the issue now, the court acted well within its discretion.

"One of the most fundamental rules of appellate review is that the time for filing a notice of appeal is jurisdictional. '[O]nce the deadline expires, the appellate court has no power to entertain the appeal.' [Citation.]" (*In re A.O.* (2015) 242 Cal.App.4th 145, 148.) A party seeking to challenge an order setting the section 366.26 hearing must file a notice of intent to file a petition for extraordinary writ within seven days if the party was present or within 12 days if the party was only notified of the order by mail. (Cal. Rules of Court, rules 5.695(f)(6), 8.450(e)(4)(A) & (B).) "'[T]he timely filing of an appropriate notice of appeal or its legal equivalent is an absolute prerequisite to the exercise of appellate jurisdiction. [Citations.]'" (*In re J.F.* (2019) 39 Cal.App.5th 70, 74-75.)

"'Failure to file a petition for extraordinary writ review within the period specified by rule . . . shall preclude subsequent review by appeal of the findings and orders made pursuant to [section 366.26.]' [Citation.]" (*In re Hannah D.* (2017) 9 Cal.App.5th 662, 678; accord, *In re A.A.* (2016) 243 Cal.App.4th 1220, 1239.) "''[A]n unappealed disposition or postdisposition order is final and binding and may not be attacked on an

---

[8] In her reply brief, mother notes, "It is unclear as to why the visitation order was not challenged earlier."

16

appeal from a later appealable order." [Citation.]' [Citations.]" (*In re S.B.* (2009) 46 Cal.4th 529, 532; accord, *In re Z.S.* (2015) 235 Cal.App.4th 754, 769, overruled on narrow grounds in *In re A.R.* (2021) 11 Cal.5th 234, 243, 251 [Where mother requested counsel file a notice of appeal, and mother's counsel mistakenly filed the notice of appeal four days late, mother has not "irrevocably lost her right to appeal the termination of her parental rights."].) "This '. . . rule' holds 'that an appellate court in a dependency proceeding may not inquire into the merits of a prior final appealable order,' even when the issues raised involve important constitutional and statutory rights. [Citation.]" (*In re Z.S.*, at pp. 769-770.)

"'We review . . . visitation orders for an abuse of discretion, and apply the substantial evidence standard to the [juvenile] court's factual findings. [Citation.] A court abuses its discretion in making a[n] . . . order if there is no reasonable basis on which it could conclude that its decision advanced the best interests of the child. [Citation.]'" (*Noble v. Superior Court* (2021) 71 Cal.App.5th 567, 578; accord *S.Y. v. Superior Court* (2018) 29 Cal.App.5th 324, 333-334; *In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356 [during reunification services]; *In re C.B.* (2010) 190 Cal.App.4th 102, 123, fn. 5 [after reunification services have been terminated, visitation orders should be focused on the best interest of the child].)

"'[T]he court abdicates its discretion [when it] permits a third party, including the dependent child, to determine whether any visitation will occur, . . . [Citations.]'" (*In re Korbin Z.* (2016) 3 Cal.App.5th 511, 518-519.) "Even after family reunification services

are terminated, visitation must continue unless the court finds it would be detrimental to the child. [Citation.]" (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1504.) "'Only when the court delegates the discretion to determine whether *any* visitation will occur does the court improperly delegate its authority . . . .' [Citation.]" (*Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 72-73.)

Here, on May 4, 2022, the social worker called mother and explained that minor cancelled the visit scheduled for that day. At the hearing the next day, the court found visitation between mother and minor detrimental.

At the hearing on June 20, 2022, at which mother was present, the juvenile court terminated mother's reunification services, set the section 366.26 hearing, and reiterated its finding that visitation would be detrimental to minor. The court orally advised mother of her right to file a notice of intent to file a petition for extraordinary writ. The court provided mother with a written notice of her writ rights reflecting that if she wished to preserve her right to appellate review of the decision, she was required to file a notice of intent to file a petition for extraordinary writ within 12 days of the June 20, 2022, order.

Nonetheless, mother did not file a notice of intent to file a petition for extraordinary writ seeking to challenge the court's orders of May 5, and June 20, 2022. Instead, mother seeks to challenge the juvenile court's visitation orders by way of an appeal of the court's order terminating her parental rights on February 23, 2024, eight months later. Far more than seven or 12 days have elapsed. We have no jurisdiction to

entertain mother's complaints about the visitation orders for which the time for appellate review has long since expired.

Even if we did, we would hold that the court acted well within its discretion in denying visitation after determining that visitation was detrimental to minor. The court did not delegate visitation decisions to minor. Minor himself refused to visit with mother on *one* occasion. At the hearing *the next day*, the court found visitation detrimental.

That decision was within the court's discretion. Minor had been engaging in negative behaviors after visitation with mother. Minor's therapist said minor would get tense and avoid the topic of how his visits with mother were going. He did not want to visit mother. A letter from minor's therapist explained that visitation with mother had increased his negative behaviors; his conflicts with mother were an obstacle for minor in meeting his treatment goals. Minor had been having behavioral issues at school as a result of visitation with mother.

After the court initially determined that visitation was detrimental, minor "appeared to make progress with his treatment goals after limiting visitations with . . . mother as evident by reduce[d] sleep difficulties and anger outbursts." Even though mother had completed her case plan, she had continued to make statements to the children that were not appropriate. Minor did not want to visit mother because it was too traumatic for him. The court then, again, found visitation between mother and minor would be detrimental. The court acted within its discretion in denying mother visitation.

Mother's complaint that the juvenile court continued to deny her visitation over the course of the pendency of the section 366.26 hearing is not borne out by the record. Our review of the record shows no instance in which mother ever requested visitation be reinstated during any of the many hearings between the time the court terminated her reunification services and when it terminated her parental rights. Mother never filed a section 388 petition seeking reinstatement of visitation. Thus, mother had many opportunities to request reinstatement of visitation, but never did so. Therefore, mother has forfeited any complaint with respect to the court reinstating visitation during that time. (*In re Sheena K.* (2007) 40 Cal.4th 875, 887 [factual issues should be raised first in the court below].)

B. ICWA

Mother contends the department erred by failing to conduct an ICWA inquiry of minor's purported paternal grandmother. We hold substantial evidence supported the court's determinations that ICWA did not apply. We further hold that neither the court nor the department were required to inquire of the purported paternal grandmother.

"""Federal regulations implementing ICWA . . . require that state courts "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child." [Citation.] The court must also "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child."""" [Citations.] 'State law, however, more broadly imposes on social services

agencies and juvenile courts (but not parents) an "affirmative and continuing duty to inquire" whether a child in the dependency proceeding "is or may be an Indian child."'" (*In re J.C.* (2022) 77 Cal.App.5th 70, 77.)

"[S]ection 224.2, subdivision (b), requires the child protective agency to ask 'the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' [Citations.]  Although commonly referred to as the 'initial duty of inquiry,' it 'begins with the initial contact' [citation] and continues throughout the dependency proceedings." (*In re J.C.*, *supra*, 77 Cal.App.5th at p. 77.)

"'"'The juvenile court must determine whether proper notice was given under ICWA and whether ICWA applies to the proceedings.'" [Citation.]  "If the court makes a finding that proper and adequate further inquiry and due diligence as required in [section 224.2] have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence."'" (*In re J.C.*, *supra*, 77 Cal.App.5th at p. 78.)

Substantial evidence supports the court's determination that ICWA did not apply to the case.  Mother initially denied having any Native American ancestry.  Mother further filed an ICWA-020 form reflecting she had no known Indian ancestry.  The court made an initial finding that ICWA did not apply to the proceedings.  (*In re S.R.* (2021) 64

Cal.App.5th 303, 312, 316 [Where the parents represented that the minor did not have Native American ancestry, the court's ICWA finding was "plainly supported at the time it made the finding."].)

Mother later reported that she was told she had Indian ancestry but was not sure.[9] The maternal grandmother "said that she was told she was Native American, but she is not sure, and she is not registered. She disclosed she thinks it could be the tribe Eagle Blackfoot, something like that." The social worker sent an ICWA email inquiry containing mother's familial information to the Blackfeet Tribe of Montana and the Indian Bureau of Affairs. The Blackfeet Nation responded that none of the children were eligible for membership and that they did not qualify as an "Indian Child."

Mother later again "reported there was Native American descent in her family. She stated her cousin . . . reported to have 1% Native American [ancestry], but it was unknown what tribe. She then stated her mother had stated they did have Native American descent, but she was unsure what tribe." The maternal uncle reported he did not know whether the family had any Native American ancestry. Later still, "mother stated that she had Indian heritage but wasn't sure what tribe, though her mother told her it was Blackfoot. When asked if anyone in her family was registered with the Blackfoot tribe, she stated she did not know."

The department noted, "As to ICWA for [minor], we did file an ICWA noticing document on June 1st, 2023 that included a response letter from the Blackfoot tribe. I

_____

[9] Mother later, again, twice denied having any Native American ancestry.

know the report states that Mother recently noted she has Native American ancestry. This was on January 9th, 2024, but she doesn't know the name of the tribe." The court found that there was no credible evidence that ICWA applied to the case. Since mother did not submit any evidence of Indian ancestry through any tribe other than Blackfeet, and since the Blackfeet Tribe responded that minor was not an Indian child for ICWA purposes, the court's finding was supported by substantial evidence.

Only after the court orally terminated mother's parental rights did she disclose information of a *possible* biological father for minor.[10] Mother asserts that the court and department erred by failing to conduct an ICWA inquiry of the purported paternal grandmother. We hold that neither the court nor the department were required to inquire of the purported paternal grandmother.

"'[P]arent" means any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or custom. It does not include the unwed father where paternity has not been acknowledged or established." (25 U.S.C § 1903(9).) "The necessity of a biological tie to the tribe is underlined by the ICWA definition of a 'parent' as 'any biological parent or parents of an

---

[10] As the juvenile court proclaimed, mother's sudden discovery of a purported father after the court had orally terminated her parental rights appears to be "a pure case of gamesmanship . . . ." "[I]f a party seeks to engage in gamesmanship to delay resolution of a case or a minor's permanency, we condemn such tactics . . . ." (*In re Dezi C.* (2022) __ Cal.5th __ [2024 Cal. LEXIS 4634, p. 49].) "We will not turn the process of ICWA notice into a game, . . ." (*In re Christopher I.* (2003) 106 Cal.App.4th 533, 566.) "[I]n terms of fundamental fairness, it is untenable gamesmanship to allow a parent to stand idly by and then raise a 'winning' ICWA issue . . . ." (*In re A.C.* (2022) 75 Cal.App.5th 1009, 1022 (dis. opn. of Crandall, J.), majority opinion overruled on other grounds in *Dezi C.*)

23

Indian child . . . .'"  (*In re E.G.* (2009) 170 Cal.App.4th 1530, 1533.)  "Until biological paternity is established, an alleged father's claims of Indian heritage do not trigger any ICWA notice requirement because, absent a biological connection, the child cannot claim Indian heritage through the alleged father."  (*Ibid*. ["until biological paternity is established for an alleged father . . . notice requirements are not activated."])

In discussing *E.G.*, the court in *In re B.R.* (2009) 176 Cal.App.4th 773, noted "there was no claim . . . that the alleged father had any adoptive or biological relationship to the child.  Under those circumstances, we agree that it was impossible for the child to meet the definition of an Indian child . . . by virtue of the child's relationship with the alleged father."  (*Id*. at p. 785.)  The court in *In re C.A.* (2018) 24 Cal.App.5th 511, noted that, for purposes of ICWA, even *presumed* parent status "is not equivalent to the status of a biological or adoptive parent."  (*Id*. at p. 521 [where presumed father was the child's stepfather].)  That court found "no statutory language, regulatory provision, or case law interpreting ICWA that suggests Congress intended to include" nonbiological parents.  (*Ibid*.)

Here, the purported father's biological paternity has neither been acknowledged nor established.  (25 U.S.C § 1903(9); *In re E.G.*, *supra*, 170 Cal.App.4th at p. 1533.)  There was no *evidence* to support any claim that the purported father was minor's biological or adoptive father; mother did not file a declaration or testify that the purported father was minor's biological father.  Thus, neither the court nor the department were

required to conduct an ICWA inquiry of the purported father, which would have been impossible, or his extended relatives.

## III.  DISPOSITION

The court's order terminating mother's parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

FIELDS
J.

25