Filed 5/23/18; Certified for Partial Publication 6/13/18 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re C.A., a Person Coming Under the Juvenile Court Law. | D073229 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J519280) |
| v. | |
| C.T. et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of San Diego County, Kimberlee Lagotta, Judge.  Affirmed.

Elena S. Min, under appointment by the Court of Appeal, for Defendant and Appellant, C.T.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant, D.A.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Jesica Fellman, Deputy County Counsel, for Plaintiff and Respondent.

C.T. and D.A. appeal the juvenile court's order terminating C.T.'s parental rights to her minor daughter, C.A., and earlier orders finding the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.) did not apply to C.A.'s presumed father, D.A., or C.A.'s biological father, D.R. We reject these challenges and affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

On December 1, 2015, the San Diego County Health and Human Services Agency (Agency) filed a petition under Welfare and Institutions Code section 300, subdivision (b),[1] after C.T. and C.A. tested positive for amphetamine and methamphetamine at C.A.'s birth. C.T. also tested positive for marijuana and admitted that she had used methamphetamine and other drugs during her pregnancy. At birth, C.T. reported that D.A. was C.A.'s father. At the detention hearing, the juvenile court appointed counsel for D.A. and C.A. The Agency's attorney, however, informed the court that D.A. was not C.A.'s biological father. As a result, the court deferred the issue of paternity to the next hearing. D.A. reported that he had Cherokee heritage, and the court deferred ICWA issues and ordered D.A. to complete the standard ICWA form. The court also added C.T.'s ex-boyfriend, D.R., to the petition as an alleged father. The court ordered C.A. detained and she was placed with a foster family.

---

1    Subsequent undesignated statutory references are to the Welfare and Institutions Code.

2

At the December 22, 2015 jurisdiction and disposition hearing, the Agency recommended the juvenile court make a true finding on the petition, remove C.A. from C.T.'s care, and that C.T. participate in reunification services. C.T. contested the Agency's recommendations and the court set the matter for trial. At the contested jurisdiction and disposition hearing, the juvenile court adopted the Agency's recommendations, continuing C.A.'s placement in foster care. D.A. did not request to elevate his paternity status and, despite active efforts, the Agency had not yet located D.R. The juvenile court found ICWA did not apply without prejudice to D.R.

Once the Agency located D.R., it set a special hearing to establish paternity for C.A. At the March 22, 2016 special hearing, the court appointed counsel for D.R. D.R. told the Agency's social worker that he had been in a relationship with C.T. for a year and a half, believed he was C.A.'s biological father, and requested a paternity test. At the same hearing, D.A. requested reunification services because he and C.T. had recently married. The juvenile court ordered services and visitation to D.A., paternity testing for D.R., and set a special hearing for May 11, 2016, to address the test results.

The May 11, 2016 special hearing was continued because the Agency had not yet received D.R.'s paternity test results. After the test results confirmed D.R. was C.A.'s biological father, the court elevated D.R. to biological status at the continued special hearing. Due to D.R.'s extensive criminal and substance abuse history, severe mental health concerns, and lack of relationship with C.A., the Agency did not believe it was in C.A.'s best interest to offer D.R. services.

3

D.R. informed the court that although he thought he might have had Native American heritage through his biological father, he had since discovered that the man he thought was his biological father was actually not his father, and he did not have any Native American heritage.[2]  Because D.R. withdrew his claim of Native American heritage, the juvenile court found ICWA did not apply.  D.R. did contest the Agency's recommendation that he be denied reunification services and the court set the matter for trial.

At the July 13, 2016 trial, D.R. withdrew his request for services.  For the six-month review hearing, which occurred at the same time, the Agency reported C.T. was participating in substance abuse treatment and was progressing with her recovery.  Based on her progress with services, the Agency had also permitted C.T. to have unsupervised visits with C.A.  D.A. was also participating in voluntary services, but had recently relapsed and had tested positive for methamphetamines.  The Agency remained concerned about C.T.'s ability to protect C.A. if D.A. was not able to maintain his sobriety.  As a result, the Agency recommended C.A. continue with her foster placement and that both C.T. and D.A. continue to receive reunification services.  The court continued services for C.T and D.A., and also elevated D.A. to presumed father status.

Before the 12-month review hearing, in August 2016, the Agency reported it was concerned with D.A.'s behavior, C.T.'s ability to set boundaries with D.A., and C.T.'s

---

2       Prior to this hearing, the Agency had sent notices based on earlier statements by D.R. and filed return receipts for the notices it sent to the Wichita Tribe and the Indian Bureau of Affairs (BIA) with the juvenile court.

failure to regularly participate in recovery meetings. By October 2016, however, C.T. had started divorce proceedings, was attending all services, testing clean, and was voluntarily participating in therapy. Based on her progress, in November 2016, the Agency approved C.T. for overnight visitation. The Agency continued to have some reservations about C.T.'s relationship with D.A. and her ability to set boundaries with him. The social worker reported, however, that C.T. and C.A. had developed a healthy bond, noting that C.A. reached for C.T. and smiled at her during visits, and C.A. would become upset if C.T. left the room.

In December, C.T. began a 60-day trial visit and at the January 3, 2017 12-month review hearing, the Agency recommended placement with C.T. The Agency recommended termination of D.A.'s voluntary services because he had relapsed, testing positive for methamphetamine and failing to report for drug testing. He had also been arrested for theft, shoplifting and using false identification and was incarcerated. The Agency noted in its report that D.R.'s sister, Michelle N., had maintained communication with the Agency and C.T. since the beginning of the dependency proceeding and stood willing to take custody of C.A. if C.T.'s reunification efforts were not successful. At the review hearing, the court followed the Agency's recommendations, placed C.A. with C.T. and set a family maintenance review hearing date.

Then, in February 2017, the Agency learned C.T. had relapsed and had used methamphetamine while caring for C.A. Despite efforts by the Agency to safety plan with C.T., between February and April 2017, she missed multiple drug tests, tested

5

positive for methamphetamine and alcohol, and failed to engage in drug treatment. As a result, the Agency filed a section 387 petition to again remove C.A. from C.T.'s custody.

At the April 18, 2017 detention hearing on the new petition, the juvenile court again removed C.A. from C.T.'s care and ordered supervised visits for C.T. The juvenile court set the matter for a jurisdiction and disposition hearing on May 9, 2017. By the time of that hearing, C.T. had entered inpatient treatment at the Family Recovery Center (FRC) and was working with a therapist to address concerns of her continuing codependence on D.A. Despite this progress, the Agency's social worker expressed concern in its report that C.T. had demonstrated poor judgement by contacting D.R. even though she had a restraining order in place because of past domestic violence.

C.T. visited C.A. twice a week at the FRC. The Agency reported that while C.A. often cried and would cling to the caregiver initially, she would eventually warm up to C.T. The Agency initiated an Interstate Compact on the Placement of Children (ICPC) evaluation for Michelle, who lived in New York and continued to express a willingness and commitment to adopt C.A. if C.T.'s reunification efforts failed. At the May 9, 2017 hearing, the Agency recommended termination of C.T.'s reunification services and that the court set a section 366.26 permanency planning hearing. C.T. set the matter for trial and requested C.A. be returned to her care.

In its report for the contested hearing, the Agency and C.T.'s therapist continued to express concerns about C.T.'s relationship with D.A., particularly her propensity to use drugs with D.A., and C.T.'s ability to protect C.A. from D.A. At the hearing, after the presentation of evidence including C.T.'s testimony, the juvenile court sustained the

6

section 387 petition, terminated C.T.'s reunification services, and set a section 366.26 hearing for October 11, 2017.

Before the section 366.26 hearing, Michelle's ICPC was approved by the Agency and the court conducted a special hearing on July 19, 2017, to consider placement of C.A. with Michelle and her husband. Michelle and her family had begun regular video chats with C.A., and Michelle planned a visit to San Diego to facilitate placement of C.A. in her care. C.T. objected to placing C.A. out of state and set the matter for trial. At the August 11, 2017 contested special hearing, the juvenile court placed C.A. with Michelle in New York.

For the section 366.26 permanency planning hearing, the Agency reported that prior to C.A.'s placement with Michelle, C.T. was having generally appropriate visits with C.A. three times each week. The social worker reported that C.A. looked to her caregiver to have her needs met during the visits and that while C.A. was generally happy during visits with C.T., she was also happy when they ended. Once the court ordered C.A. placed with Michelle, C.T. abruptly left FRC, stopped attending drug court, and did not attend scheduled visitation with C.A. the last week of August before her move to New York. The following month, C.T. resumed compliance with drug court and began looking for a new treatment program. When Michelle and her husband were in San Diego to take custody of C.A., they attempted to schedule visitation with C.A. for C.T., but C.T. did not attend because she thought it would be too emotionally difficult.

By the time of the section 366.26 hearing in October 2017, C.A. was having regular phone contact with C.T. The calls were difficult and C.T. was frequently

7

emotional and crying, which caused C.A., who was almost two at that time, to become upset and confused. C.A. was thriving in her placement and began calling Michelle "[m]ommy" and her husband "[d]adda." The Agency recommended termination of parental rights, and both C.T. and D.A. set the matter for trial, asserting the parent-child relationship exception to adoption applied.

C.T. continued with phone calls and video chats with C.A., but continued to exhibit inappropriate behavior. She would tell C.A. that she belonged to her and never should have been taken away, resulting in Michelle cutting the calls short. On one occasion, C.T. began yelling at Michelle about C.A. calling her mommy while C.A. was still on speaker phone.

At the contested hearing on December 1, 2017, C.T. did not appear before the court and her counsel requested a continuance. The court denied the request, and entered the Agency's reports into evidence. The Agency made its social worker available for cross-examination, but none of the attorneys questioned her. After closing arguments, the court found by clear and convincing evidence that C.A. was specifically and generally adoptable and that no exception to adoption applied. With respect to its finding that the parent-child relationship exception to adoption did not apply, the court noted that C.A. was removed from C.T.'s care at birth, had spent most of her young life in foster care, referred to Michelle as " '[m]ama,' " and looked to Michelle to meet her needs. The court also noted C.T.'s visits were no longer regular or consistent by the time of the hearing. The court terminated parental rights and set a postpermanency planning hearing for May 24, 2018. C.T. and D.A. timely appealed.

DISCUSSION

C.T. contests the court's ICWA rulings with respect to D.R. and contends the trial court erred by finding the beneficial parent-child relationship exception to adoption did not apply. D.A. joins in C.T.'s latter argument, and contends the court erred by not providing ICWA notice based on his assertion of Native American heritage. C.T. joins this argument.

I

*ICWA Notice*

A

"In proceedings that potentially involve an Indian child, ICWA requires notice on any affected Indian tribe: 'In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe . . . of the pending proceedings and of their right of intervention. . . .' (25 U.S.C. § 1912(a); see *In re Gerardo A.* (2004) 119 Cal.App.4th 988, 994; see also § 224.2, subds. (a), (b).) ICWA's notice requirement is a ' "key component of the congressional goal to protect and preserve Indian tribes and Indian families." ' [Citation] '[T]he tribe's right to assert jurisdiction over the proceeding or to intervene in it is meaningless if the tribe has no notice that the action is pending.' " (*In re D.C.* (2015) 243 Cal.App.4th 41, 60 (*D.C.*).)

When a court knows or has reason to know that an Indian child is involved in a juvenile dependency proceeding, a duty arises under ICWA to provide notice to the

9

Indian child's tribe of the pending proceedings and the tribe's right to intervene. (25 U.S.C. § 1912(a); § 224.3, subds. (a) & (d).) "Alternatively, if there is insufficient reason to believe a child is an Indian child, notice need not be given." (*In re Shane G.* (2008) 166 Cal.App.4th 1532, 1538.) An Indian child is defined by ICWA as "any unmarried person under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).)

Under ICWA, the child welfare agency must file the ICWA notice, return receipts and any responses from the tribes with the court, so the court can make an informed determination as to whether sufficient notice was provided. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 175.) The notice requirements are strictly construed. (*In re G.S.R.* (2008) 159 Cal.App.4th 1202, 1216.)

B

C.T. contends that the order terminating her parental rights must be reversed because the Agency failed to file the notices it sent to the Wichita Tribe and the BIA after D.R. indicated that he might have Native American heritage. She argues that because the Agency only filed the signed returned receipts from the Wichita Tribe and the BIA, the record was insufficient to support the juvenile court's finding that ICWA did not apply. In response, the Agency argues that the court's finding was not error because D.R. withdrew his claim of Native American heritage. We agree.

In California, the Agency and the court have a duty to ensure that an adequate inquiry regarding Native American ancestry is completed. (*In re A.B.* (2008) 164

10

Cal.App.4th 832, 838.) In this case, the duty was satisfied. Although D.R. initially indicated that he may have had Native American heritage, at the June 13, 2016 special hearing, D.R. explained that he had learned new information about his parents and did not have any Native American heritage. The court then appropriately concluded that ICWA did not apply.[3]

C

D.A. and C.T. assert that the juvenile court's order terminating C.T.'s parental rights must be reversed because the court did not provide ICWA notice based on D.A.'s claim of possible Native American heritage. The Agency responds that under the relevant statutes, the Agency and the court did not have an obligation to provide ICWA notice on behalf of D.A., who was not C.A.'s biological or adoptive father. The Agency further asserts that even though D.A. was elevated to the status of presumed father, this change did not trigger a requirement to provide notice under ICWA. We agree with the Agency that the relevant statutes are clear that notice was not required in this circumstance.

As stated, ICWA defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian

---

[3] In the alternative, the Agency also filed a motion to augment the record with postjudgment evidence, showing that after the appeal was taken it belatedly filed copies of the notices that were sent to the Wichita Tribe and the BIA. We dismiss the motion as moot, but note that the documents confirm the Agency did provide adequate notice to the Wichita Tribe and the BIA on May 27, 2016.

11

tribe." (25 U.S.C. § 1903(4).) Likewise, a "parent" is defined as "any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or custom. It does not include the unwed father where paternity has not been acknowledged or established." (25 U.S.C. § 1903(9).)

No published decision has considered whether ICWA's notice requirements apply to an individual in D.A.'s situation. In 2009, the Third District Court of Appeal held that under ICWA's provisions, "[u]ntil biological paternity is established, an alleged father's claims of Indian heritage do not trigger any ICWA notice requirement because, absent a biological connection, the child cannot claim Indian heritage through the alleged father." (*In re E.G.* (2009) 170 Cal.App.4th 1530, 1533 (*E.G.*); see *In re Francisco D.* (2014) 230 Cal.App.4th 73, 84 [Rejecting argument that ICWA notice required where adoptive mother is a member of a tribe and holding ICWA is inapplicable unless the child is "a member of an Indian Tribe" or "the biological child of a member of a tribe."].) In *E.G.*, the mother argued the court erred by finding ICWA inapplicable when one of two alleged fathers she identified at the beginning of the proceeding indicated he might have Native American heritage. (*E.G.*, at p. 1532.) A paternity test, however, ruled him out as the dependent child's biological father and the Court of Appeal affirmed the trial court's rejection of the mother's claim on that basis. (*Ibid*.)

A subsequent appellate decision, *In re B.R.* (2009) 176 Cal.App.4th 773 (*B.R.*), expanded ICWA's notice requirements to a biological father, who claimed possible Native American heritage because he was legally adopted by a man who might have been

12

a member of the Apache Tribe.  (*Id*. at pp. 784-785.)  Similarly, this court recently held that notice was required where the adoptive parents of the minor in the dependency proceeding asserted Native American heritage.  (*D.C., supra*, 243 Cal.App.4th at pp. 62-64.)

We do not agree with D.A. and C.T. that the expansion of the ICWA provision to include an adoptive family relationship in these cases leads to the conclusion that the Agency was required to provide notice here.  Indeed, in distinguishing *E.G.*, the *B.R.* opinion noted "there was no claim in *E.G.* that the alleged father had any adoptive *or* biological relationship to the child.  Under those circumstances, we agree that it was impossible for the child to meet the definition of an Indian child under section 1903(4) by virtue of the child's relationship with the alleged father."  (*B.R., supra*, 176 Cal.App.4th at p. 785.)

Unlike *B.R.* and *D.C.*, here there is neither a biological relationship between D.A. and C.A., nor an adoptive one.  D.A.'s appearance in the proceeding at its earlier stage and attempts to reunify with C.A. suggested D.A. hoped eventually to become her adoptive parent.  Those efforts, however, did not prove successful.  Although D.A. was elevated to the status of a presumed father based on his marriage to C.T., the reunification services provided to D.A. were terminated at the six-month review hearing after he was arrested and C.T. ended her relationship with him.

As the Agency points out, the "[t]he extent to which a father may participate in dependency proceedings and his rights in those proceedings are dependent on his paternal status."  (*In re Christopher M.* (2003) 113 Cal.App.4th 155, 159.)  The highest status a

father can obtain is "presumed" father, which entitles the father to receive reunification services and is based on the state's interest in "preserving the integrity of the family and legitimate concern for the welfare of the child." (*In re Nicholas H.* (2002) 28 Cal.4th 56, 65.) This status, however, is not equivalent to the status of a biological or adoptive parent. D.A. points to no statutory language, regulatory provision, or case law interpreting ICWA that suggests Congress intended to include this circumstance in the statutory definition of Indian child. To apply ICWA's notice provision to D.A. would result in an improper expansion of the definition of an Indian child contained in the statute. Accordingly, we affirm the juvenile court's order finding ICWA inapplicable to D.A.

II

*Beneficial Parent-Child Relationship Exception to Adoption*

A

After reunification services are terminated, the focus of a dependency proceeding shifts from preserving the family to promoting the best interests of the child, including the child's interest in a stable, permanent placement that allows the caregiver to make a full emotional commitment to the child. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.) At the permanency planning hearing, the court has three options: (1) terminate parental rights and order adoption as the permanent plan; (2) appoint a legal guardian for the child; or (3) order the child placed in long-term foster care. (*Ibid.*)

"Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) If the court finds a child

14

cannot be returned to his or her parent and is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds termination of parental rights would be detrimental to the child under one of the specified statutory exceptions. (§ 366.26, subd. (c)(1)(A) & (B)(i)-(vi); *In re Erik P.* (2002) 104 Cal.App.4th 395, 401.) "The parent has the burden of establishing the existence of any circumstance that constitutes an exception to termination of parental rights." (*In re T.S.* (2009) 175 Cal.App.4th 1031, 1039.) Because a selection and implementation hearing occurs "after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

Section 366.26, subdivision (c)(1)(B)(i), provides an exception to the adoption preference if termination of parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." Courts have interpreted the phrase " 'benefit from continuing the . . . relationship' " to refer to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed,

15

the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H., supra*, 27 Cal.App.4th at p. 575; accord, *In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)

The parent asserting the exception will not meet his or her burden by showing the existence of a "friendly and loving relationship," an emotional bond with the parent, or pleasant, even frequent, visits. (*In re J.C.* (2014) 226 Cal.App.4th 503, 529; *In re C.F.* (2011) 193 Cal.App.4th 549, 555; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419; *In re L.S.* (2014) 230 Cal.App.4th 1183, 1200 ["To avoid termination of parental rights, it is not enough to show that a parent-child bond exists."].) Rather, there must be a parental role in the child's life, resulting in a significant, positive emotional attachment from the child to parent that if severed would result in harm to the child. (*In re C.F.*, at p. 555; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324; see *In re J.C.*, at p. 529 [observing that interaction between a natural parent and child will always confer some incidental benefit to the child and for the exception to apply, " 'a parental relationship is necessary' "].)

"We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.) " 'We uphold judgments if they are correct for any reason, "regardless of the correctness of the grounds upon which the court reached its conclusion." [Citation.] "It is judicial action

and not judicial reasoning which is the subject of review. . . ." ' " (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 876.)

B

C.T. contends the juvenile court erred by finding the beneficial parent-child relationship exception to adoption did not apply. She asserts that she maintained regular visitation with C.A. throughout the dependency and that the benefit of her continued relationship with C.A. outweighed the benefits that adoption affords. The juvenile court indicated that C.T.'s visitation was initially regular and consistent, but that it had waned after C.T.'s relapse. The court then ruled that even if it were to find that C.T.'s contact with C.A. was regular, C.A. did not share a parent-child bond with C.T. such that terminating C.T.'s parental rights would be detrimental to C.A.

As discussed, the beneficial parent-child relationship exception to adoption requires the court to "balance[] the strength and quality of the natural parent[-]child relationship . . . against the security and the sense of belonging a new family would confer." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) Said another way, the exception applies only if a parent shows that his or her relationship with the child " ' "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." ' " (*In re Anthony B., supra*, 239 Cal.App.4th at pp. 396-397.)

Contrary to C.T.'s assertions, the record supported the juvenile court's conclusion that the exception did not apply because any detriment to C.A. that would result from severing C.T.'s parental rights was outweighed by the benefits of adoption. Although

17

C.T.'s interactions with C.A. were pleasant and positive, the evidence supported the court's finding that she did not occupy a parental role in C.A.'s life. Indeed, by the time of the permanency planning hearing C.A. had been out of C.T.'s care for most of her life and was thriving in Michelle's home. She looked to Michelle to fulfill her needs and there was no indication that she would be negatively impacted by the termination of C.T.'s parental rights. In addition, by the time of hearing even C.T.'s video visitation with C.A. was problematic. C.T. was unable to refrain from talking about the case in an inappropriate manner and the visits needed to be cut short as a result. This behavior further exposed the absence of a parent-child relationship between C.T. and C.A.

These facts sufficiently supported the court's finding that C.T. had not shown the existence of a beneficial relationship and the court's conclusion that termination of C.T.'s parental rights would not be detrimental to C.A. did not constitute an abuse of discretion.[4]

---

[4] C.T.'s reliance on *In re S.B.* (2008) 164 Cal.App.4th 289, 298-299, *In re Amber M.* (2002) 103 Cal.App.4th 681, 689, and *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534 is misplaced. Among other important distinctions, in all three cases, the parents introduced evidence showing the strong parent-child bond they shared with their child. No such showing was made by C.T. in this case.

DISPOSITION

The orders are affirmed.

IRION, Acting P. J.

WE CONCUR:

DATO, J.

GUERRERO, J.

19

Filed 6/13/18

**CERTIFIED FOR PARTIAL PUBLICATION**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re C.A., a Person Coming Under the Juvenile Court Law. | D073229 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. J519280) |
| Plaintiff and Respondent, | ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |
| v. | |
| C.T. et al., | |
| Defendants and Appellants. | |

THE COURT:

The opinion filed May 23, 2018, was not certified for publication. The request pursuant to California Rules of Court, rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion, with the exception of part II meets the standards for publication as specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be partially published in the Official Reports.

IRION, Acting P. J.

Copies to: All parties