Filed 2/11/25  In re A.H. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.H., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>K.H.,<br><br>        Defendant and Appellant. | E084441<br><br>(Super. Ct. No. DPIN2200074)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Elizabeth Tucker, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed in part, conditionally reversed and remanded with directions in part.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham, and Julie Jarvi, Deputy County Counsels, for Plaintiff and Respondent.

# I.

# INTRODUCTION

Defendant and appellant K.H. is the mother of two-year-old A.H.  Mother appeals from the juvenile court's order terminating her parental rights as to A.H.[1]  (Welf. & Inst. Code,[2] § 366.26)  On appeal, Mother contends (1) the juvenile court abused its discretion by denying her section 388 petition to modify the court's prior order terminating her services, and (2) plaintiff and respondent, the Riverside County Department of Public Social Services (DPSS) and the juvenile court failed to comply with the duty of inquiry under the Indian Child Welfare Act of 1978 (ICWA)[3] (25 U.S.C. § 1901 et seq.) and related state law.

We find the juvenile court did not abuse its discretion in denying Mother's section 388 petition.  However, we conditionally reverse the order terminating parental rights and remand this matter to the juvenile court to comply with the duty of inquiry under subdivision (b) of section 224.2.

---

[1]  M.L. (alleged father of A.H.) is not a party to this appeal.

[2]  All future statutory references are to the Welfare and Institutions Code.

[3]  "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1, overruled on other grounds in *In re Dezi C.* (2024) 16 Cal.5th 1112, 1152, fn. 18. (*Dezi C.*).)

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

In September 2022, DPSS received an immediate response referral with allegations of general neglect after Mother gave birth to A.H.  Mother had previously tested positive for methamphetamines, amphetamines, and MDMA (ecstasy) on July 3, August 26, September 14, and September 22, 2022.  She also tested positive for amphetamines, methamphetamines, and ecstasy upon hospital admission.  Mother admitted to frequently using methamphetamine, but denied knowing she used ecstasy.  Mother had repeatedly stated to hospital staff that she would kill herself if she was not able to take A.H. home with her.  Due to concerns about Mother's statements, Mother had a "one-on-one sitter" with her in the hospital room at all times.  Mother denied any treatment or hospitalizations for mental health.  However, Mother reported that 10 years earlier a man who was suicidal jumped in front of her car and she hit and killed him.  She denied being arrested or having any treatment.

The medical social worker confirmed that both A.H. and Mother tested positive for methamphetamine, amphetamine, and ecstasy.  After delivery, A.H. was immediately intubated as she was prematurely born and unable to breathe on her own.  A.H. was below birth weight, undergoing phototherapy, and was on an IV due to poor appetite.  The medical social worker was also worried about Mother's mood swings as she was easily "'agitated'" with hospital staff and exhibited extreme fluctuations in mood with crying one moment and then crying, yelling, and or expressing self-harming statements

3

the next.  On a few occasions, hospital staff reported that they thought Mother was going to physically attack them because of her threats and intimidation.  She had verbalized thoughts of killing herself if she could not leave the hospital with her baby.

Mother claimed she only used substances a couple of times while pregnant because she needed energy to care for the maternal grandmother as her caretaker.  She asserted that she did not have a problem with substances and did not want help.  She stated that now that she has given birth, she would never use drugs again.  She disclosed that she used methamphetamines for 22 years, and began using when she was 16 years old to cope with her traumatic childhood surrounded by the maternal great grandmother's physical and verbal abuse and alcoholism.  Mother's longest period of sobriety since the age of 16 had been for one year.

Mother had limited family support.  The maternal grandmother was unable to assist with caring for A.H. due to the maternal grandmother's medical condition and lingering side effects from a stroke.  The maternal grandfather was unable to assist due to his work schedule.  Mother disclosed a current diagnosis of depression and post-traumatic stress disorder.  Her only treatment was seeing a therapist "'a few times' to 'vent.'"  She quit mental health services because she did not believe that it helped.

On September 30, 2022, the medical social worker reported that Mother was pending discharge, but there was no discharge date for A.H. due to her ongoing health concerns.  Mother continued to threaten to kill herself if the baby was removed from her care. The NICU staff noticed that A.H.'s right arm was moving abnormally.  The

4

immobility in her right arm was diagnosed as erbs palsy. This was typically caused by the nerves being pinched during birth and A.H. would require physical therapy.

Mother visited A.H. with maternal aunt, I.H. I.H. reported concerns regarding Mother's mental state and continuous methamphetamine use. I.H. stated that the Mother had anger issues and scared her. I.H. confirmed to the social worker that Mother had been using methamphetamine continuously since the age of 16. I.H. did not know what Mother looked like or acted like when sober because I.H. could not remember Mother ever being sober. According to I.H., Mother had been placed on section 5150 holds numerous times throughout the past 22 years of her drug usage due to expressing suicidal thoughts and ideations. I.H. explained that Mother had delusional and paranoid thoughts that led to anger, aggression, and overall unpredictable behavior.

On October 7, 2022, a petition was filed on behalf of A.H. pursuant to section 300, subdivisions (a) and (b)(1) based on A.H.'s medical condition due to Mother's drug use while pregnant, Mother's drug use and mental illness, and alleged father's drug use and criminal history. An amended petition was filed on November 21, 2022, to correct the child's name and spelling. According to the Indian Child Inquiry Attachment to the petition, DPSS conducted an ICWA inquiry of Mother and the man she identified as the father of A.H., J.S.[4] Both Mother and J.S. gave no reason to believe A.H. was or maybe an Indian child. A.H. remained in the Neonatal Intensive Care Unit (NICU) due to respiratory and feeding issues.

_____

[4] A paternity test later revealed that J.S. was not the father of A.H.

5

On October 10, 2022, Mother filed an ICWA-020 Parental Notification of Indian Status form (ICWA-020) indicating that none of the ICWA options on the form applied.

The detention hearing was held on October 10, 2022. At that time, Mother's counsel informed the juvenile court that Mother indicated "ICWA did not apply to her." Although Mother was present in court, the juvenile court did not personally inquire of Mother as to her Native American ancestry. The court found that there was no reason to believe or reason to know A.H. was an Indian child and that ICWA did not apply. The court formally detained A.H. and provided Mother with services, including supervised visitation, pending the jurisdictional/dispositional hearing. A.H. was eventually placed into a medically fragile foster home, and Mother began an outpatient drug treatment program.

On October 30, 2022, an ICWA inquiry was conducted of Mother where she denied ever living on an Indian Reservation/Rancheria community, having attended school or received services or benefits from a tribe or services that were available to Native Americans such as Indian Health Services. Mother stated that she used to smoke marijuana, but no longer did, and identified her drug of choice to be methamphetamine. She claimed that she needed methamphetamine to get through the day and that she used methamphetamine to be energized and to take care of the maternal grandmother and other responsibilities.

Mother had drug related charges which resulted in her losing her driving privileges between 2013 and 2015. She stated that she stopped using controlled substances due to

her strong will, remained sober for eight months, and then relapsed in 2016. She denied ever participating in a rehabilitation program, but she was open to it. She stated that she was serious about becoming sober and reunifying with A.H. She self-enrolled in an outpatient program. Mother denied that she had any formal diagnoses or that she was placed on psychiatric holds for being a danger to herself. She also denied that she had a plan to kill herself while in the hospital and instead claimed that she had made suicidal statements because she was frustrated and scared that she would lose A.H. Mother claimed that I. made up stories about her being emotionally unstable. Mother lived with the maternal grandparents, and was the maternal grandmother's caretaker.

Several relatives were considered for placement of A.H. On October 24, 2022, the social worker spoke to an alleged paternal uncle, J.G., who stated that he would like to be considered for placement. J.G. also disclosed that he had an extensive criminal history and that he lived out of state in Arizona. Maternal aunt I.H. and maternal great aunt V.G. both also stated that they wanted to be considered for placement. An application for placement was submitted on maternal great aunt V.'s behalf. Maternal great aunt V.G. later withdrew her application citing health issues. Mother stated that she would like maternal aunt J. to care for A.H. permanently if she was unable to reunify with A.H.

On December 12, 2022, Mother identified M.L. as someone who may be A.H.'s father. His whereabouts were unknown. Mother claimed to enter an inpatient drug treatment program at MFI Recovery Center (MFI). On November 29, 2022, Mother stated that she was voluntarily exiting the MFI facility and admitting herself to the House

of Hope inpatient facility. She stated that she did not feel she was learning enough at MFI and needed a change. Mother later explained that she left MFI because she had a disagreement with another resident. On December 26, 2022, Mother informed the social worker that the maternal grandmother had a "heart stroke" and was on life support. She also stated that she left House of Hope to be with the maternal grandmother in the hospital. Mother asserted that she planned to admit herself to a different inpatient facility at the Gibson Home once she resolved her family issues. According to House of Hope, Mother was terminated from the program on December 20, 2022, after leaving the facility at 12:00 a.m. and failing to disclose that she had a family emergency.

A second amended petition was filed on December 29, 2022, omitting the allegations against J.S.

On January 5, 2023, Mother informed the social worker that she was going to the Gibson Home inpatient facility. However, on January 20, 2023, Mother stated that she was dismissed from the Gibson Home as her behaviors appeared threatening to one of the substance abuse counselors. On January 27, 2022, Mother stated that she was being admitted to the MFI inpatient facility in Hemet.

The jurisdictional/dispositional hearing on the second amended petition was held on February 14, 2023. Mother was present in court. At that time, the juvenile court inquired of Mother whether she had any Native American ancestry. After Mother replied in the negative, the court found that ICWA did not apply. The court found true the allegations in the second amended petition, declared A.H. a dependent of the court, and

provided Mother with reunification services and supervised visitation. M.L. was found to be an alleged father and was denied reunification services.

A.H. required nerve transfer surgery because it was determined that she had "'right brachial plexus birth injury.'" After the surgery, A.H.'s arm was placed in a cast which was removed on July 13, 2023. A.H. thereafter wore an arm brace.

DPSS conducted an ICWA inquiry of Mother on April 27, May 22, and July 11, 2023. Mother denied having any Native American ancestry. An inquiry of alleged father M.L. did not occur because his whereabouts were unknown.

By the six-month review hearing in August 2023, Mother was living in a sober living home where she planned to stay for at least a year. She supported herself by working as a caretaker for her mother, doing side jobs for the sober living home manager, and occasional financial help from the maternal grandfather. Mother had been fully compliant with her case plan objectives, which included staying free from drugs, complying with mental health treatment, and demonstrating appropriate parenting to meet A.H.'s specialized medical needs. Mother completed anger management, parenting, special education, and both inpatient and outpatient services. She was also in the process of attending individual therapy sessions and appeared to benefit from services. She needed to complete a psychotropic medication evaluation as she had not acknowledged her mental health issues during face-to-face contacts. Aside from missing one drug test on May 2, 2023, she tested negative on all drug tests.

9

According to the caretakers who supervised Mother's visits with A.H., Mother was in a relationship with someone she referred to as "'wifey,'" and Mother did not want DPSS to know about her girlfriend "'wifey.'" Mother informed A.H.'s caretakers that her girlfriend had a criminal record and was facing possible prison time. Mother would FaceTime her girlfriend on her phone at almost every visit. Mother, however, denied being in a relationship.

On August 14, 2023, the juvenile court authorized DPSS to liberalize Mother's visitation as she had been compliant with her case plan.

Alleged paternal uncle, J.G., reached out to DPSS again on September 5, 2023, stating that he would like to be considered for placement. DPSS was working with J.G. to obtain more information to initiate the placement process.

The contested six-month review hearing was held on September 28, 2023. At that time, the juvenile court found that ICWA did not apply and continued Mother's reunification services for an additional six months.

Alleged father M.L. was located in November 2023. After his identity was confirmed by an employee of DPSS while on the phone with him, M.L. hung up the phone. DPSS was unable to conduct an ICWA inquiry of M.L. because he did not cooperate with DPSS.

On November 3, 2023, Mother again denied having any Native American ancestry. Mother continued to reside in a sober living home. She tested positive for amphetamine and methamphetamine on November 6, 2023. Mother claimed it was due to her taking diet pills from Mexico. According to the caregiver, the bottle of diet pills "clearly said it contained amphetamines." Mother also missed drug tests on September 21 and October 12, 2023. Mother stated that she re-enrolled in outpatient drug treatment services. Although Mother's visits with A.H. had progressed to unsupervised on October 31, 2023, they returned to being supervised after her positive drug test. On August 31, 2023, Mother informed DPSS that she would re-enroll in parenting classes with MFI, and on November 13, 2023, Mother informed DPSS that she re-enrolled with Triple P Parenting via SafeCare.

According to the caregiver, the quality of Mother's visits with A.H. had improved. The caregiver reported that Mother was really trying to improve and ask questions. Mother had attended all of A.H.'s doctor's appointments and was involved. Mother brought items needed for A.H. at the visits and tried hard to soothe her. She only had one unsupervised visit prior to testing positive and then visitation went back to being supervised.

On December 5, 2023, the juvenile court ordered a hair follicle drug test for Mother. Mother submitted to a hair follicle test on December 6, 2023, and the results were negative for all substances. On December 28, 2023, DPSS learned that Mother had bleached her hair. On January 2, 2024, DPSS observed Mother having streaks of brown

and black hair.  Mother stated she "'toned/highlighted/dyed'" her hair the week before Thanksgiving and denied bleaching her hair.  A.H.'s caregivers, however, noticed that Mother had "freshly bleached hair" when they saw her on December 18, 2023.  Mother failed to attend a drug test on December 7, 2023.  In addition, reportedly Mother received multiple calls from "her 'drug friends in Blythe'" during her holiday visit.  Mother also reportedly stated that she was back in a relationship with her previous partner who had prior CPS history and was potentially facing jail time.  Mother denied these allegations.  According to the caregivers, Mother told them that she was back together with her girlfriend "'wifey'" and told them not to tell DPSS about wifey.

A contested 12-month review hearing was held on January 8, 2024.  The juvenile court found that ICWA did not apply, DPSS had conducted a sufficient further inquiry, there was no new information to indicate ICWA may now apply, and there was no reason to know whether A.H. was an Indian child.  The court terminated Mother's reunification services, and set a section 366.26 hearing.

A.H. had remained in her placement since being discharged from the hospital for over 17 months and was doing well and thriving.  Her caregivers, who were her prospective adoptive parents, continued to meet all of A.H.'s extensive needs, including specialized medical appointments and procedures and developmental services such as physical and occupational therapies.  In addition, A.H. had a strong bond with her caregivers and foster siblings in the home.  She looked to them for reassurance and was easily comforted by them.  She appeared to be a happy and content child who was

12

thriving in her caregivers' home and had become an integral part of the family.  Her caregivers desired to adopt A.H. and provide her with stability and permanency and were capable of meeting A.H.'s physical, medical, emotional, and developmental needs.

A.H. attended occupational therapy weekly as of March 2024.  She had a Brachial Plexus appointment for a medical injection.  A.H. needed splinting daily (two different splints), two more surgeries for her shoulder and elbow, and possibly an additional surgery for a nerve transfer depending on what was observed from the two surgeries.  A.H. could also have more surgeries in the future as she grew older.  She needed at home therapy throughout the day such as stretching and "'taping.'"  The caregivers reported that Mother had not been regularly attending A.H.'s appointments despite being provided with a list of her appointments.

Mother visited A.H. on a weekly basis for four hours.  At a March 2024 visit, Mother stated that she did not want A.H. to undergo any more surgeries.  Mother regularly ended her visits 30 to 40 minutes early because she said A.H. was tired. Starting February 29, 2024, a DPSS worker had to assist with supervising visits as Mother stated that the caregivers were intimidating her.  However, Mother denied making this statement and clarified that she was okay with the caregivers supervising her visits.  At the February 29, 2024, visit, A.H. became fussy and distraught when the caregiver left the room.  At a visit on March 7, 2024, A.H. was fussy and did not want to be held by Mother, who reportedly tried to keep A.H. on the couch for the duration of the visit.  A.H. wanted to be with DPSS's worker throughout the visit.  A.H. occasionally hit

13

Mother when Mother would try to hold her. Furthermore, Mother was unable to console A.H. or change her diaper without assistance. At an April 28, 2024, visit, A.H. tried to bite Mother after she tried to pick her up. Mother appeared to not recognize A.H.'s emotional and physical cues and body language during visits, which resulted in A.H. physically retaliating by hitting, pinching, throwing things, or biting Mother. Although Mother claimed to end the April 4, 2024, visit early because A.H. was tired, DPSS observed A.H. running around before the visit ended.

Mother admitted herself to an inpatient drug treatment program on February 17, 2024, but left the program on March 14, 2024. She completed 27 days of treatment and chose to leave early. She had her first intake session with outpatient on April 8, 2024, as she missed the first scheduled intake.

On April 4, 2024, DPSS conducted an ICWA inquiry on Mother. Mother again denied having any Native American ancestry. DPSS attempted to conduct an ICWA inquiry of alleged father M.L., but he was not responsive.

On May 6, 2024, Mother filed a section 388 petition, requesting reunification services and increased visitation. As to change circumstances, she asserted that she completed her case plan, post case plan, had reenrolled in an outpatient program, and was continuing with her sober living and testing negative for drugs. As to the best interest of the child, Mother claimed that A.H. was bonded to her, the visits had been positive and consistent, and that she had benefited from her services and addressed her issues. In

14

support, she attached letters from her service providers, drug test results and certificates of completion.  The petition was set for a hearing.

On May 7, 2024, A.H.'s caregivers were granted de facto parent status.

On May 14, 2024, DPSS was informed about visitation concerns.  Mother reportedly appeared to step away when she needed to comfort A.H. and instead allowed the caregiver to comfort her.  Mother blamed the caregiver for A.H.'s behaviors during visitations.  On May 22, 2024, Mother was "'disturbed'" about A.H. "'screaming'" when Mother attempted to change her diaper.  At the May 30, 2024, visit, Mother reportedly brought a knife to the visit to unscrew a new toy vacuum she had purchased for A.H.

On June 10, 2024, the juvenile court held a hearing on Mother's section 388 petition.  Mother testified that she completed individual counseling, a parenting program, medical fragile training, two substance abuse programs, and SafeCare.  She also completed a mental health assessment and maintained sobriety.  She stated that she benefited from her case plan and explained that she took a diet pill from Mexico which caused her to have a "dirty" test.  She retested both by taking a urine and hair follicle tests, and both tests were negative.  When asked about her bleached hair that caused her to have a false negative drug test, Mother asserted that she had her hair done prior to Thanksgiving and that she submitted to the hair follicle test in December.  She claimed her hair was colored and not bleached.

Regarding visitation, Mother stated A.H. did not fuss during visitation when it was just her and A.H. However, when the caretaker was present A.H. ignored Mother and only paid attention to the caretaker. Mother believed A.H. was not bonding with her because she did not get to be alone with A.H. and that the caregiver was in the room at all times during visitations. She claimed that she was unable to soothe A.H. during visits because she did not get time to bond with her due to her being in foster care. She also acknowledged that she was unable to change A.H.'s diaper and blamed it on the presence of the caretaker. She further acknowledged that she should not have left A.H.'s doctor's appointment when A.H. received shots. She stated that she terminated "a few" visits early due to A.H. being tired. She asked that the caretaker supervise visits again because she felt the only way she could have visits was if the caregivers brought A.H. and supervised the visits. She stated her visitation was always monitored by "the camera and foster parent." Mother further testified that she had a home that was adequate for placement. She denied stating that she did not want surgery for A.H. or that she was in a relationship.

Following testimony and argument, the juvenile court denied Mother's section 388 petition. When making its findings, the court concluded, even giving Mother the benefit of the doubt that there was a change in circumstance, the court did not see how it was in the child's best interest to grant the petition. The court also stated that it was not sure if changed circumstances were sufficiently shown. The court subsequently explained that it

16

was going to deny the section 388 petition because it did not believe granting it was in the child's best interests.

The court thereafter held the section 366.26 hearing. The court found A.H. to be adoptable and terminated Mother's parental rights. Mother timely appealed.

## III.

## DISCUSSION

A. *Denial of Section 388 Petition*

Mother contends the juvenile court abused its discretion in denying her section 388 petition because she had shown she was proactive in resolving her issues and was on track to establishing a significant mother-daughter relationship with A.H. We disagree.

Under section 388, a parent may petition the court to change, modify, or set aside a previous court order. To prevail on a section 388 petition, the parent ultimately bears the burden to show by a preponderance of the evidence that there is a change of circumstances or new evidence, and the proposed modification is in the child's best interests. (*In re Malick T.* (2022) 73 Cal.App.5th 1109, 1122, citing *In re Jasmon O.* (1994) 8 Cal.4th 398, 414-415, *In re Stephanie M.* (1994) 7 Cal.4th 295, 317; see *In re D.P.* (2023) 92 Cal.App.5th 1282, 1291.) "[A] change of circumstances" requires that circumstances have substantially and materially changed. (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) "'"[N]ew evidence' . . . means material evidence that, with due diligence, the party could not have presented at the dependency proceeding at which the

17

order, sought to be modified or set aside, was entered.""" (*In re Matthew M.* (2023) 88 Cal.App.5th 1186, 1195.)

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 309; *In re D.P.*, *supra*, 92 Cal.App.5th at p. 1295; *In re J.M.* (2020) 50 Cal.App.5th 833, 847.) "[A] parent's petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527 (*J.C.*).)

We review the juvenile court's denial of a section 388 petition for abuse of discretion. (*In re R.A.* (2021) 61 Cal.App.5th 826, 837; *In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.) "Under this standard of review, we will not disturb the decision of the trial court unless the trial court exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination." (*In re A.S.* (2009) 180 Cal.App.4th 351, 358, citing *In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 421.) "We do not inquire whether substantial evidence would have supported a different order, nor do

we reweigh the evidence and substitute our judgment for that of the juvenile court. [Citation.]  We ask only whether the juvenile court abused its discretion with respect to the order it made." (*In re Matthew M.*, *supra*, 88 Cal.App.5th at p. 1195; see *In re Maya L.* (2014) 232 Cal.App.4th 81, 104, fn. 6.)  "'""When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."'" (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319; see *In re I.B.* (2020) 53 Cal.App.5th 133, 153.)

Here, the juvenile court ordered an evidentiary hearing on Mother's section 388 petition, and concluded even if Mother had shown a change in circumstances, she failed to show modifying the court order would be in A.H.'s best interests.  As discussed, "a primary consideration in determining the child's best interests is the goal of assuring stability and continuity.  [Citation.]  'When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role.  That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child.'" (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317; accord, *In re I.B.*, *supra*, 53 Cal.App.5th at p. 159; see *J.C.*, *supra*, 226 Cal.App.4th at p. 527 ["after reunification services have terminated, a parent's petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability"].)

19

Mother failed to show how granting additional reunification services and liberalized visitation would promote permanence and stability for A.H. In fact, the evidence showed the opposite. Since September 2022, A.H. has lived with her caretakers for essentially all of her young life. After she was discharged from the hospital after staying in the NICU for about one month, A.H. was placed with her caretakers, who have provided for her specialized physical and developmental needs for approximately 26 months. A.H. had only the one caregivers and never lived with Mother. Mother failed to show that A.H.'s needs for permanency and stability would be advanced by granting her section 388 petition. A.H. was in a prospective adoptive home which was the only home she had known. A.H. was happy and content in the home and she was thriving developmentally, emotionally and physically. A.H. looked to her caregivers for comfort and reassurance while she treated Mother like a stranger during visits. A.H. best interests were not to further delay permanency and stability in hopes A.H. would be able to form a significant bond with Mother. (*J.C.*, *supra*, 226 Cal.App.4th at p. 527.) Mother's best interests were "simply no longer the focus." (*Ibid*.)

At best, Mother presented an uncertain future for A.H., in contrast to the stability and permanency her caregivers provided her. (See *In re Stephanie M*., *supra*, 7 Cal.4th at pp. 318-319 [where the child had "special needs," the juvenile court did not abuse its discretion in "placing special weight on the child's need for stability"]; *J.C.*, *supra*, 226 Cal.App.4th at p. 526 [where the child had "a loving and stable placement" for most of her life, the mother failed to show how her child's "best interests in *permanency and*

20

*stability* would be furthered by the proposed modification"].) Furthermore, the evidence shows that A.H. had a significant bond to her caregivers as opposed to her mother. (See *In re D.P.*, *supra*, 92 Cal.App.5th at p. 1295 [juvenile court properly focused on the "'positive and secure attachments'" between the child and her foster family and "expressed concern about the 'trauma' [the child] would face if she were 'removed . . . from a family that she has known since only a few days old'"]; *In re M.H.* (2018) 21 Cal.App.5th 1296, 1305-1306 [though placing the child with a relative may have offered the child "important biological family connections," the juvenile court did not abuse its discretion in keeping the child with his foster family, given "the uncertainty of how [he] would respond to removal from the parental figures he had known since birth"].)

Based on the foregoing, it is reasonable to conclude that returning A.H. to Mother's care would not advance A.H.'s need for permanency and stability. As such, Mother has not shown the juvenile court abused its discretion regarding A.H.'s best interests.

B. *ICWA*

Mother contends conditional reversal is required because DPSS did not ask all identified extended family members about their Native American ancestry as required by section 224.2, subdivision (b) and the juvenile court failed to ensure an appropriate inquiry had been conducted. DPSS concedes the ICWA errors and acknowledges conditional reversal of the parental rights termination orders is required to allow for ICWA compliance. We agree DPSS must make a further inquiry and the court erred by

terminating parental rights without ensuring DPSS complied with ICWA or without making a further finding concerning ICWA's applicability.

"'ICWA is a federal law giving Indian tribes concurrent jurisdiction over state court child custody proceedings that involve Indian children living off of a reservation. [Citations.]  Congress enacted ICWA to further the federal policy "'that, where possible, an Indian child should remain in the Indian community . . . .'"'" (*In re A.R.* (2022) 77 Cal.App.5th 197, 203.)  To that end, "ICWA notice ensures that an Indian tribe is aware of its right to intervene in or, where appropriate, exercise jurisdiction over a child custody proceeding involving an Indian child." (*In re Isaiah W.* (2016) 1 Cal.5th 1, 8; see *In re J.C.* (2022) 77 Cal.App.5th 70, 77.)

In California, section 224.2 "codifies and elaborates on ICWA's requirements of notice to a child's parents or legal guardian, Indian custodian, and Indian tribe, and to the [Bureau of Indian Affairs]." (*In re Isaiah W.*, *supra*, 1 Cal.5th at p. 9.)  The statute "creates three distinct duties regarding ICWA in dependency proceedings.  First, from [DPSS]'s initial contact with a minor and [their] family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child.  [Citation.] Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then [DPSS] 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.'  [Citation.]  Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

"[O]nce a child is placed into the temporary custody of a county welfare department, the duty to inquire 'includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child.'" (*Dezi C.*, *supra*, 16 Cal.5th at p. 1132.) Absent contrary law or custom of the Indian child's tribe, the term "extended family member" includes "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

"""'The juvenile court must determine whether proper notice was given under ICWA and whether ICWA applies to the proceedings.'" [Citation.] "If the court makes a finding that proper and adequate further inquiry and due diligence as required in [section 224.2] have been conducted and there is no reason to know . . . the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence.""" (*In re J.C.*, *supra*, 77 Cal.App.5th at p. 78.) The court must make a determination concerning ICWA's applicability before termination of parental rights even if it previously found ICWA inapplicable. (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141.)

Here, the record on appeal reflects DPSS was aware of several extended family members—including the maternal grandparents, maternal aunt I.H., and a maternal great aunt—but the record does not reflect DPSS made any ICWA inquiries to them.[5] Furthermore, the juvenile court did not make any oral or written ICWA findings at the termination of the parental rights hearing. On this record, we must conclude the court erred, and the challenged orders must be conditionally reversed to allow for ICWA compliance. (*Dezi C.*, *supra*, 16 Cal.5th at p. 1152.)

IV.

DISPOSITION

The parental termination orders are conditionally reversed. The matter is remanded to the juvenile court with the following directions: DPSS must file a report demonstrating compliance with its duty of further inquiry under ICWA and sections 224.2 and 224.3. The court must conduct a hearing to determine whether DPSS's

_____

[5] As to paternal relatives, DPSS was not required to inquire of them as they were merely alleged fathers and not a "parent" as defined by the ICWA. Under ICWA, a "parent" is defined as "any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or custom." (25 U.S.C. § 1903(9); see also § 1903(4), [defining "Indian child" as "any unmarried person who is . . . eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe"].) The statute expressly excludes from the definition of "parent" an "unwed father where paternity has not been acknowledged or established." (*Id.*, § 1903(9); see also *In re C.A.* (2018) 24 Cal.App.5th 511, 520 [definition of parent does not include an unwed father where paternity has not been acknowledged or established]; *In re E.G.* (2009) 170 Cal.App.4th 1530, 1533 ["[A]bsent a biological connection, the child cannot claim Indian heritage through the alleged father."].)

24

investigation satisfied its duties under ICWA.  The court may also consider any other ICWA-related issues that may have arisen during this appeal.

On remand, if the juvenile court finds a proper and adequate further inquiry and due diligence have been conducted and concludes ICWA does not apply (§ 224.2, subd. (i)(2)), it shall reinstate the termination orders.  If the court concludes ICWA applies, it shall proceed with ICWA and California implementing provisions.  (See 25 U.S.C. § 1912, subd. (a); §§ 224.2, subd. (i)(1); 224.3, 224.4.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

RAPHAEL
J.